**In re CLUB ASSOCIATES, a Georgia Limited Partnership, Debtor.**

**Bankruptcy No. 87–01356**

United States Bankruptcy Court,
N.D. Georgia,
Atlanta Division.

Sept. 18, 1989.

Mark S. Kaufman, J. James Johnson, Long, Aldridge & Norman, Atlanta, Ga., for debtor.

Joseph Scott Jacobson, Holt, Ney, Zatcoff & Wasserman, Atlanta, Ga., for Vinland Property Trust.

## ORDER

MARGARET H. MURPHY, Bankruptcy Judge.

This matter is before the court on Debtor's Second Amended Plan of Reorganization filed January 19, 1989 (hereinafter the "Plan"). Debtor's Second Amended Disclosure Statement was approved by order entered February 7, 1989. Consolidated Capital Realty Corporation (hereinafter "CCRI")[1] objects to confirmation of the Plan. A hearing on confirmation of the Plan commenced after due notice March 13, 1989. The presentation of evidence continued March 14, March 15, March 17, March 29, and April 20 (hereinafter the "Confirmation Hearings"). Closing arguments were heard June 13, 1989.

Debtor Club Associates (hereinafter "Club") filed its voluntary Chapter 11 petition February 23, 1987.[2] Club has two general partners, Club One Investors (hereinafter "Club One") and Club Two Investors (hereinafter "Club Two"). The sole limited partner of Club is Collins Powell, who holds one-tenth of a one percent interest in the limited partnership. Club was formed in 1984 for the purpose of acquiring, owning, and operating the Tahoe Club Apartments in DeKalb County, Georgia, a 652–unit complex (hereinafter the "Project") located on 52 acres in Clarkston, Georgia (hereinafter the "Property"). A portion of the Property is subject to a ground lease. Both Club One and Club Two are limited partnerships with numerous individual limited partners. The general partner of each of Club One and Club Two is Investors Realty Group II (hereinafter "IRG II"), a general partnership. David Baker is a general partner of IRG II.

Club purchased the Property from CCRI November 30, 1984, for a purchase price of $26,800,000. Club paid $4,800,000 in cash at closing and gave CCRI a promissory note for the $22,000,000 balance of the purchase price (hereinafter the "Note"). The Note is a wraparound note, which includes three prior first mortgages,[3] the principal balances of which aggregate approximately $7,800,000. The Note provides for interest-only payments during the ten-year term of the Note, with the $22,000,000 principal balance coming due at maturity November 30, 1994. Interest accrual was calculated on the $22,000,000 principal balance of the Note. The rate of interest accrual was 8.89771% per annum for the first seven years of the Note's term. For the last three years of the Note's term, interest was to accrue at a rate 1% higher than a specified prime rate, with a minimum interest rate of 12% and a maximum rate of 17%. The weighted contract rate was 9.45%. The amount of the monthly interest payment due under the Note was less than the amount of interest accruing at the rates stated above. In years eight through ten, unpaid and accrued interest was to have been added to the principal balance of the Note and accrue further interest to be paid at maturity. Interest accrued but unpaid during years one through seven was merely deferred but accrued no further interest. In years 8–10,

---

1. On August 29, 1989, CCRI filed a Notice of Name Change which informed the court that, at a meeting of CCRI's Board of Trustees held April 13, 1989, CCRI's name was changed to "Vinland Property Trust."

2. By order of the predecessor judge assigned to this case, Club was allowed an indefinite extension of the exclusive period within which to file its Plan. The extension was based on the pivot-al connection to the Plan of the outcome of Adversary Proceeding No. 87–0296A.

3. The Project was built in three phases and each phase has its own first mortgage. CCRI's wraparound mortgage wraps around all three, and a ground lease, to encompass the entire Property.

CCRI was to have been eligible to receive additional interest payments from the net cash flow from the Project. The Note provides for CCRI to pay all principal and interest payments on the first mortgage loans as well as all payments on the ground lease.

Under the Plan, claims of Club's creditors are divided into 11 classes. Class 1 consists of administrative expenses and claims with priority pursuant to 11 U.S.C. §§ 503(b) and 507(a). Allowed claims in Class 1 will be paid in cash in full on the effective date of the Plan (hereinafter the "Effective Date") except for such claims as may fall due after the Effective Date or as to which the holder consents to payments in monthly installments after the Effective Date. Class 1 is not impaired under the Plan.

Class 2 contains only the claim of CCRI. CCRI's claim includes the original principal balance under the Note of $22,000,000 plus approximately $691,000 in unpaid prepetition interest payments. Under the Plan, part of CCRI's claim will be paid as of the Effective Date by applying a substantial portion of payments made by Club to CCRI after the filing of the Chapter 11 petition and prior to the Effective Date (hereinafter the "Postpetition Payments"). The balance of CCRI's claim will be paid in full by deferred payments over a period of not more than ten years, together with interest at an annual rate of 10%. Class 2 is impaired under the Plan and CCRI objects to confirmation of the Plan.

Class 3 includes only the secured claim of Sun Life Assurance Company of Canada ("Sun Life"), which holds a note dated January 20, 1972, secured by a first priority lien on one parcel of the Property in the original principal amount of $3,450,000 maturing March 1, 2002. The loan evidenced by Sun Life's note, to which Club is not a party, is not and has not been in default. Under the Plan, as under the terms of the original wraparound Note made in favor of CCRI, CCRI will remain responsible for making all payments of principal and interest on Sun Life's note as they become due. The Plan provides for the following modification of Sun Life's loan documents: in the event of a default under Sun Life's note, Sun Life will be required to provide Club written notice of said default and the opportunity to cure said default within five days of Club's receipt of notice. Class 3 is impaired and has accepted the Plan.

Class 4 includes only the secured claim of American Savings Bank, which holds a note dated November 26, 1976, secured by a first priority lien on a second parcel of the Property in the original principal amount of $2,750,000 maturing November 30, 1990. The loan evidenced by American Savings Bank's note, to which Club is not a party, is not and has not been in default. Under the Plan, as under the terms of the original wraparound Note made in favor of CCRI, CCRI will remain responsible for making all payments of principal and interest on American Savings Bank's note as they become due. As with Sun Life, the Plan provides for the modification of American Savings Bank's loan documents such that in the event of a default under American Savings Bank's note, American Savings Bank will be required to provide Club written notice of said default and the opportunity to cure said default within five days of Club's receipt of notice. The Plan also provides that the maturity date of American Savings Bank's note will be extended for two years until November 30, 1992. Class 4 is impaired and has accepted the Plan.

Class 5 includes only the secured claim of Transamerica Life Insurance and Annuity Company (hereinafter "Transamerica"), which holds a note dated October 26, 1978, secured by a first priority lien on a third parcel of the Property in the original principal amount of $3,000,000 maturing November 1, 1998. The loan evidenced by Transamerica's note, to which Club is not a party, is not and has not been in default. Under the Plan, as under the terms of the original wraparound Note made in favor of CCRI, CCRI will remain responsible for making all payments of principal and interest on Transamerica's note as they become due. As with Sun Life, the Plan provides for the modification of Transamerica's loan documents such that in the event of a de-

fault under Transamerica's note, Transamerica will be required to provide Club written notice of said default and the opportunity to cure said default within five days of Club's receipt of notice. Class 5 is impaired under the Plan and has accepted the Plan.

Class 6 includes only the claim of the lessor under a ground lease on one portion of the project. The ground lease was assumed by Club pursuant to this Court's order entered April 24, 1987. No defaults or arrearages in payments are due under the ground lease, and the Plan provides for the continuation of all payments due under the ground lease. Class 6 is not impaired under the Plan.

Class 7 includes the general unsecured claims of Club's trade creditors. The allowed claims of the five creditors holding claims designated in Class 7 totals $10,358.41. Under the Plan, holders of claims of Class 7 will be paid 80% of the amount of their claims in cash within thirty (30) days after the Effective Date. Class 7 is impaired. Four of the five creditors in Class 7 holding allowed claims in the aggregate amount of $10,265.50 have accepted the Plan.

Class 8 includes the claims of tenants of the Project who have security deposits held by Club. Under the Plan, each such tenant will be treated in accordance with the provisions of the tenant's lease agreement with Club. Class 8 is not impaired under the Plan.

Class 9 includes only the unsecured claim of Club's general partner, Club Two, in the approximate amount of $109,000, evidenced by a promissory note dated November 30, 1984, originally in favor of Maccabee Realty Company. Under the Plan, the Class 9 claim will be paid in full only after all other creditors have been paid in accordance with the Plan and then only upon the sale of the Property or the maturity of the wraparound Note as modified pursuant to the Plan. Class 9 is impaired and has accepted the Plan.

Class 10 includes only the unsecured claim of Investors Realty Group, Inc. (hereinafter "IRG") for partnership administration fees payable prior to the Effective Date. Under the Plan, IRG will receive nothing on such claim. Class 10 is impaired and has accepted the Plan.

Class 11 includes the unsecured claims of Club's general partners, Club One and Club Two, for funds advanced or loaned to Club prior to the Effective Date [4] in the aggregate amount of $41,997.42. Under the Plan, the Class 11 claims will be paid in full only after all other creditors have been paid pursuant to the provisions of the Plan, and only upon a sale of the Property or upon maturity of the wraparound Note as modified under the Plan. Class 11 is impaired and has accepted the Plan.

Two classes of interests are designated in the Plan. Class 12 includes the allowed interests of Club One and Club Two as general partners of Club. Class 13 consists of the allowed interest of Collins Powell as the sole limited partner of Club. Under the Plan, Class 12 and Class 13 are not impaired.

Prior to the filing of the petition, Investors Realty Management, Inc. (hereinafter "IRM"), a property management company in which Mr. Baker and Mr. Powell are the principals, managed the Project pursuant to a contract with Club for which IRM received 5% of the gross income of the Project on a monthly basis. After the filing of the petition, IRM continued to operate as the property manager in return for a fee equal to 4% of the gross income pursuant to this Court's order. Under the Plan, IRM has agreed to continue to manage the Project after the Plan is confirmed for a fee equal to 4% of the Project's gross income on a monthly basis.

Prior to the filing of the Chapter 11 petition, IRG performed administrative services for Club and was compensated therefor. Since the filing of the Chapter 11 petition, IRG has continued to perform

---

**4.** Although funds loaned to Club postpetition might have been entitled to priority as administrative claims, prepetition and postpetition claims have apparently been lumped together and treated as claims subordinate to those of unsecured creditors.

those services but has received no fee. Under the Plan, IRG will continue to provide partnership administrative services to Club and has agreed it will receive no compensation for the continuing provision of these services. No other affiliated person or entity is to be employed or receive compensation for services under the Plan.

Expert testimony was offered at the Confirmation Hearings concerning the present fair market value of the Property. Valuation of income-producing real property like that in the instant case is usually most reliably achieved by using the income approach which, reduced to its simplest terms, involves dividing the property's stabilized net operating income by a chosen capitalization rate. Whereas the stabilized net operating income for the Project is essentially undisputed, the parties do not agree concerning an appropriate capitalization rate. A capitalization rate is chosen after consideration of the many factors reflected in the capitalization rate, including the status of the national and local economies, current interest rates, and the age and condition of the property. Thus, a capitalization rate fluctuates as a result of facts both within and beyond the control of the property owner. The value of property may, and often does, increase or decrease significantly purely as a result of fluctuations in the prime interest rate, which, in turn, indirectly reflects forces at work in the national economy.

In the instant case, employing a stabilized net operating income for the Project of $1,794,998 and a capitalization rate of 9.25% at the confirmation hearings, Club's

appraiser concluded the current fair market value of the Property is $18.75 million.[5] By using capitalization rates ranging from 8.0% to 9.75%, the value of the Property would range from $17,760,000 to $21,800,000.

The Project is well located and, apart from the roofs, which are generally at or near the end of their useful lives, the Project is generally attractive and in good overall condition. No substantial physical deterioration has occurred to reduce the value of the Property since the filing of the Chapter 11 proceeding. The Project is, however, somewhat older than several newer apartment complexes which are located nearby. On the other hand, the economic outlook of the Project appears stable as a result of the sustained, slightly higher revenues from the Project since September 1988.

The Court finds the use of a capitalization rate of 9.25 is appropriate. Therefore, the fair market value of the Property, as of the date of the Confirmation Hearings, was $18.75 million. CCRI's claim, prior to the application of Club's Postpetition Payments, is $22,691,000. Therefore, CCRI is undersecured.[6]

At hearings held in connection with the motion for relief from stay, which hearings began February 11, 1988 and concluded July 20, 1988, both parties presented appraisal testimony.[7] Appraisal testimony presented by Club supported Club's contention that the fair market value of the Property exceeded the principal amount of CCRI's claim. On the other hand, apprais-

---

5. The appraiser's calculation of fair market value also included deductions for items such as deferred maintenance, which are reasonable and unaffected by the capitalization rate.

6. Pursuant to 11 U.S.C. § 506(b), an oversecured creditor is allowed post-petition interest on its claim. If a creditor's claim is not oversecured, however, accrual of interest stops on the date the petition is filed. 11 U.S.C. § 502(b)(2); *United Savings Association v. Timbers of Inwood Forest Associates, Limited,* 484 U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988); *Vanston Bondholders Protective Committee v. Green,* 329 U.S. 156, 67 S.Ct. 237, 91 L.Ed. 162 (1946); *Sexton v. Dreyfus,* 219 U.S. 339, 31 S.Ct. 256, 55 L.Ed. 244 (1911).

7. Although during the course of this case, valuation of the Property by Club differed widely from that of CCRI, the valuation of the Property by Club and CCRI has now converged. Although rental income of the Project has remained stable during the pendency of the case, capitalization rates have fluctuated with the market, as discussed above, *supra* at page 390–91. Additionally, removal of internal self-governance provisions by MAI, which provided for investigations of two or more appraisals of the same parcel of property which varied by more than 10%, now seems to result in greater divergence of opinion among MAI appraisers.

al testimony presented by CCRI supported CCRI's contention that it was undersecured and that the property was decreasing in value. In the order entered January 12, 1989 denying CCRI's motion for relief from the stay (hereinafter the "MLS Order"), the fair market value of the Property as of July, 1988 was estimated to be between $21.621 million and $22.201 million. That range of value was reached utilizing a capitalization rate of 8.5.

As of the date of the Confirmation Hearings, the value of the Property was $18.75 million. Supra at page 10. As the Effective Date is not so distant therefrom, the value of the Property is unlikely to change significantly. Therefore, the value of the Property as of the Effective Date will be the same as its value at the time of the Confirmation Hearings. Based on the appraisal and other expert testimony presented at the hearings in connection with the motion for relief from stay and confirmation concerning current value, together with the fluctuations in value as a result of the economy and market conditions, as of the date the petition was filed the value of the property was $22 million. Thus, during the pendency of Club's petition, the value of the Property has decreased by $3.25 million.

The parties stipulated that the total amount of payments made by Club to or for the benefit of CCRI from the date the Chapter 11 petition was filed until the commencement of the Confirmation Hearings in March 1989 was $3,148,041. Testimony at the hearing April 20, 1989 and Club's monthly reports filed with the Court show that the following Postpetition Payments have been made by Club since the Confirmation Hearings commenced: for February 1989, $152,693; for March 1989, $152,241; for April 1989, $153,752; for May 1989, $150,148; for June 1989, $148,652; and for July 1989, $120,445.[8] For purposes of confirmation, the Postpetition Payments yet to be made by Club prior to the Plan's Effective Date can reasonably be estimated for August 1989 and each month thereafter at $150,000. The Court finds that the total amount of Club's Postpetition Payments as of the date of entry of this order will be approximately $4,325,972, calculated as follows:

| | |
|---|---|
| Payments made as of March 13, 1989: | $3,148,041 |
| Payment for February 1989 (actual): | 152,693 |
| Payment for March 1989 (actual): | 152,241 |
| Payment for April 1989 (actual): | 153,752 |
| Payment for May 1989 (actual): | 150,148 |
| Payment for June 1989 (actual): | 148,652 |
| Payment for July 1989 (actual): | 120,445 |
| Payment for August 1989 (estimated): | 150,000 |
| Payment for September 1989 (estimated): | 150,000 |
| TOTAL | $4,325,972[9] |

The parties agree that such portions of the Postpetition Payments as have been or will be applied to pay ad valorem tax liabilities should not be applied in satisfaction of CCRI's claim. The parties stipulate that $512,578 of Club's Postpetition Payments have been or will be deposited into tax escrow accounts with the underlying secured creditors to pay ad valorem tax liabilities for the Property.[10] Club contends

8. The July 1989 Postpetition Payment fell below $150,000 primarily as a result of the annual payment of Project insurance at a cost of approximately $22,000.

9. The total of Postpetition Payments must be adjusted as of the Effective Date as a result of Postpetition Payments made during the 60–day period between the date of entry of this order and the Effective Date.

10. To the extent that those funds are not actually expended for ad valorem taxes on the Property or tax services, CCRI shall be required to return funds to Club by reducing its principal, by refunding the amount of the overage to Club

that an additional amount, representing interest on each monthly Postpetition Payment, should be applied in partial satisfaction of CCRI's claim. The amount of such interest which Club proposes to apply to CCRI's claim as of the Effective Date is approximately $311,731, based on an interest rate of 7% per year, compounded monthly, which Club might have received in a money market account if it had retained the Postpetition Payments.

As noted above, CCRI comprises the only class which has not accepted the Plan and objects to confirmation pursuant to 11 U.S.C. § 1128(b). If the objections of a party in interest are sustained, the plan cannot be confirmed; therefore, CCRI's objections to Debtor's Plan will be considered before the other technical requirements of § 1129. *See, In re Huckabee Auto Co.*, 33 B.R. 132 (Bankr.M.D.Ga.1981).

CCRI raises the following objections to the Plan:

1. The Postpetition Payments may not be allocated, as provided in the Plan, to reduce the original principal amount of CCRI's claim.

2. The Plan is not fair and equitable because the payments to CCRI which Debtor proposes would result in negative amortization of CCRI's claim.

3. The Plan violates the absolute priority rule.

4. The Plan unfairly discriminates against CCRI because it fails to classify CCRI's unsecured claim with that of other unsecured creditors in Class 7.

5. The interest rate which Club proposes to pay CCRI during the term of the Plan will not guarantee that CCRI receives 100% of the present

value of its claim as of the Effective Date.

6. The Plan is not feasible.

7. The Plan is not in the best interests of Club's creditors because it does not guarantee that creditors will receive more than they would if the case were a case under Chapter 7.

8. The Plan was not proposed in good faith.[11]

## CCRI'S OBJECTIONS

### 1. ALLOCATION OF POSTPETITION PAYMENTS

The amount of the debt owed by Club to CCRI on the Effective Date of the Plan is a threshold issue. The Plan proposes to allocate the Postpetition Payments to reduce the principal amount of the debt as of the Effective Date. A favorable result for Club on this issue is at the heart of Club's arguments with respect to several of CCRI's objections to confirmation. Therefore, consideration of this issue at the outset is both appropriate and necessary.

CCRI argues the Postpetition Payments, which were made pursuant to an agreed cash collateral order, were adequate protection payments.[12] The principles of adequate protection with respect to use of cash collateral pursuant to 11 U.S.C. § 363 are similar to, if not the same as, those applied in motions for relief from the automatic stay of 11 U.S.C. § 362. *McCombs Properties VI, Ltd. v. First Texas Savings Association*, 88 B.R. 261 (Bankr.C.D.Cal. 1988). CCRI argues that the Postpetition Payments are not allocable to reduce any portion of the debt because such payments should be treated only as adequate protection payments for any deterioration in the value of the Property. Such a result, how-

---

or by some other means acceptable to the parties or, if the parties cannot agree, to the court.

**11.** CCRI also objects to the Plan because it "does not require Debtor to repay CCRI for the operating expenses which have been paid from its cash collateral in violation of 11 U.S.C. §§ 507(b), 507(a)(1) and 1129(a)(9)(A)." This contention of CCRI, however, was considered and resolved in Debtor's favor in the order entered April 14, 1989.

**12.** While the agreed cash collateral order did not specify that the payments were adequate protection payments, the MLS Order, which denied CCRI's motion for relief from stay, noted that if the Property were decreasing in value, CCRI was adequately protected by its receipt of the Postpetition Payments. 11 U.S.C. § 363(a), (c) & (e).

ever, is inconsistent with policies of the Bankruptcy Code.

■ Although the Bankruptcy Code recognizes in §§ 361, 362, 363, and 364 that adequate protection payments may be required in certain circumstances, nowhere does the Bankruptcy Code address how such payments should be treated upon the confirmation of a debtor's plan of reorganization. In the case of *United Savings Association v. Timbers of Inwood Forest Associates, Ltd.*, 484 U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988) (hereinafter *"Timbers"*), however, the United States Supreme Court shed some light on the nature of adequate protection payments. The *Timbers* Court recognized that payments to an undersecured creditor for lost opportunities which result from the imposition of the automatic stay during the pendency of a bankruptcy case would result in a windfall to the creditor. The Court indicated that adequate protection payments are intended primarily to protect the creditor from diminution in value of its collateral during the pendency of a bankruptcy case. Although the rate of depreciation of equipment and other such property is easy to anticipate and quantify, *See, Fruehauf Corp. v. Yale Express System*, 370 F.2d 433 (2d Cir.1966); *In re Bermec*, 445 F.2d 367 (2d Cir.1971), a decrease in the value of real property is not easy to quantify because so many variable, external and uncontrollable factors can affect the value of real property—local market conditions, interest rates, the national economy, the tax laws, etc. If the secured creditor is suffering no loss other than nonreceipt of regular monthly payments and inability to foreclose, the creditor is not entitled to adequate protection. The logical result of such a policy is that adequate protection payments are intended to replace the value of the collateral lost during the pendency

of the case. That result can be accomplished by applying the payments to reduce the principal amount of the loan.[13]

■ In the instant case, the value of CCRI's collateral has decreased by $3.25 million. Thus, arguably, CCRI's claim has been segmented into a secured claim of $18.75 million and an unsecured claim of $3.25 million.[14] During the pendency of the petition, however, CCRI received adequate protection payments which protected its claim from the decrease in the Property's value. Never has the policy of bankruptcy law been to pay unsecured creditors twice. Therefore, the Postpetition Payments may be allocated to reduce the $22.0 million principal balance of the Note, which will have the net effect of paying the portion of CCRI's secured claim which has become unsecured during the pendency of the case.

The issue of allocation of the Postpetition Payments in the instant case is unique as a result of the timing of events which occurred during the pendency of the case. In the instant case, the parties negotiated the terms of an agreed Cash Collateral Order which provided for the Postpetition Payments. The Order does not reflect their intention to consider the Postpetition Payments as adequate protection. The Cash Collateral Order was entered prior to the entry of the decision in the *Timbers* case, therefore, no presumption can be made that the parties' primary consideration was to provide adequate protection from the decreasing value of the Property. The entry of the decision in the *Timbers* case, however, made the postpetition decrease in value of the collateral *the* primary consideration. Additionally, the standards set forth in the *Timbers* case created the issue presented in the instant case: how to allo-

---

**13.** In some instances, a creditor can be adequately protected by means other than payments to the secured creditor. For example, a creditor may be offered a replacement lien in other unencumbered property. *In re Shockley Forest Industries, Inc.*, 5 B.R. 160 (Bankr.N.D. Ga.1980). A creditor may be adequately protected by payments to third parties such as payments for insurance or taxes. *Pagni v.*

*Pleasant Valley, Inc.*, 6 B.R. 13 (Bankr.D.Nev. 1980). Such forms of adequate protection would not result in a reduction of the amount of the creditor's claim.

**14.** That portion of CCRI's claim arising from prepetition accrued interest of $691,000 is also unsecured.

cate the Postpetition Payments at confirmation.

The few courts which have considered the issue have almost uniformly held that postpetition adequate protection payments may be allocated by the debtor in its plan of reorganization to satisfy creditors' claims. In the case of *In re Rich International Airways, Inc.*, 50 B.R. 17 (Bankr.S. D.Fla.1985),[15] the court held that adequate protection payments made during the pendency of a Chapter 11 case would be credited to the principal owed to the creditor.

> [A] secured creditor should not benefit by the filing of the Chapter 11 and in effect receive compensation greater than the amount owed and agreed upon prepetition. A secured creditor should not receive more than the benefit of his bargain.

*Id.* at 18.

Similarly, in another pre-*Timbers* case, in the case of *In re Canaveral Seafoods, Inc.*, 79 B.R. 57 (Bankr.M.D.Fla.1987), the court held the creditor's claim would be reduced by the amount of adequate protection payments received. The court relied on the Fifth Circuit case which the Supreme Court affirmed, *United Savings Association of Texas v. Timbers of Inwood Forest Associates, Ltd.*, 793 F.2d 1380 (1986), *reh'g denied*, 808 F.2d 363 (5th Cir.1987).

Relying on the decisions in the *Rich* case and in the *Timbers* case, in the case of *In re Kain*, 86 B.R. 506 (Bankr.W.D.Mich. 1988), the court held that postpetition payments "must be applied to reduce the total allowed claim of the [secured creditor]." Finally, in the case of *Fairfax Savings v. Sherwood Square Associates*, 87 B.R. 388 (Bankr.D.Md.1988), although the court refused to apply the *Timbers* decision retroactively, the court relied on the *Timbers* analysis to conclude that the debtor would be allowed to apply the adequate protection payments previously paid to the first

monthly payments to the secured creditor provided for by the debtor's plan of reorganization. The only court which refused to apply adequate protection payments to prepetition debt, *DeFranco v. Ralph D. Kaiser Co., Inc.*, 93 B.R. 307 (Bankr.D.D.C. 1988), did so with little analysis as to the basis for its decision. As a result, that decision is not persuasive here.

CCRI argues in the alternative that if a portion of the Postpetition Payments should be applied to its prepetition debt, that amount should be limited to the amount by which the principal balances on the underlying mortgages were reduced. The parties do not dispute that, during the pendency of this case, a portion of the Postpetition Payments were, in turn, used to make principal and interest payments to the underlying mortgagees.[16] CCRI argues it is entitled to protection of its "wrap equity"—i.e., the amount by which the principal balance on the Note exceeds the principal balances of the underlying notes. CCRI argues that its wrap equity, reduced by the decrease in the value of the collateral, was preserved by the Postpetition Payments only to the extent that the principal balances on the underlying mortgages were reduced. Club contends that, because of the nature of the wraparound note, CCRI is not entitled to protection of its wrap equity.

CCRI relies on the line of cases which hold that a second mortgagee can be adequately protected by payments to a first mortgagee. *Albion Production Credit Association v. Langley*, 30 B.R. 595 (Bankr.N.D.Ind.1983); *In re McKillips*, 81 B.R. 454 (Bankr.N.D.Ill.1987); *Atlanta English Village, Ltd. v. Ridgemont Apartment Associates, Ltd.*, Case No. 88–02855 (Bankr.N.D.Ga. August 11, 1988); *aff'd* 110 B.R. 77 (N.D.Ga.1989). Those cases recognize that, during the pendency of a bankruptcy case, a second mortgagee's

---

**15.** Although the *Rich* decision was entered before the U.S. Supreme Court decision in the *Timbers* case, it was entered in accordance with the principles set forth in *Timbers*.

**16.** Prepetition, CCRI "hypothecated" its Club note to First Union National Bank, so that

Club's payments to CCRI went directly to First Union, as reflected in the Cash Collateral Order. Because the hypothecation was subject to the existing obligations of CCRI, First Union was obligated to discharge CCRI's obligation to pay the underlying mortgages.

interest in the collateral may be eroded by accrual of the first mortgagee's postpetition interest (pursuant to 11 U.S.C. § 506, an oversecured creditor is entitled to such interest). CCRI's reliance on those cases ignores, however, two principles inherent in the holdings of those cases. First, in the instant case, CCRI's interest in the collateral was not, and could not have been, eroded by the accrual of postpetition interest by the underlying mortgagees because the underlying mortgages have never been in default. Therefore, no postpetition interest accrued.[17]

Second, and more significantly, CCRI's argument ignores the character of its loan to Club. The financing negotiated by CCRI and Club in 1984 was not structured as a discrete second priority note and mortgage but as a wraparound note and security deed. The primary characteristic of a wraparound note is that it includes, or wraps around, the balance of a prior underlying debt. That unique characteristic of the wraparound loan contrasts with the nature of a typical second mortgage. With a wraparound loan, the primary debtor-creditor relationship is between the wraparound mortgagee—here, CCRI—and the mortgagor—Club. The wraparound mortgagee remains primarily liable for payment of the underlying first mortgages but the wraparound mortgagor is not. The flow of payments, from the mortgagor to the wraparound mortgagee and then from the wraparound mortgagee to the underlying first mortgagee(s), reflect the essential difference between a discrete second mortgage and a wraparound.

On the other hand, if a second mortgage, rather than a wraparound loan, were used as a financing vehicle, the mortgagor would have a primary debtor-creditor relationship with each of the first and second mortgagees. Payments would flow from the mortgagor to both the first and second mortgagees. The second mortgagee would not be liable to the first mortgagee unless the second mortgagee chose to indirectly incur the liability by payment to protect its own investment.

The original principal amount of the wraparound note between Club and CCRI was $22,000,000, which included underlying first mortgage notes totaling approximately $7,800,000. If a second mortgage rather than a wraparound mortgage had been employed to finance the transaction between Club and CCRI, Club would have assumed and become primarily liable for the first mortgages and, theoretically, might have given a second mortgage equal to approximately $14,200,000 to CCRI.[18]

A choice to use wraparound financing instead of second mortgage financing in a sale of real estate is not an arbitrary or meaningless choice and can result in significant economic and tax benefits for the seller and the buyer. With wraparound financing, the seller's tax liability on the capital gain which results from the sale can be deferred by reporting the sale under the tax rules applicable to installment sales of real property.[19] The seller could benefit from a wraparound loan by decreasing the gross profit ratio because the ratio would be calculated on the higher gross sale amount which included the amount of underlying debt. As a result, the percentage

---

17. Transamerica and Sun Life have made applications for reimbursement of their attorney fees pursuant to § 506(b). Those fees, however, if allowed, are relatively minor expenses, approximately $5,000 and $13,000, in relation to the principal amounts of the notes.

18. As will be seen from the discussion below at page 39, the amount of the second mortgage would more likely have been $11,700,000 or less. The Property was originally offered for sale by CCRI at a lower price with a higher cash down payment. CCRI never varied, however, in offering wraparound financing of the sale of the Property.

19. Under the income tax laws, a seller who receives all cash (or its equivalent) becomes liable for the tax on the entire capital gain from a sale of property in the tax year in which the sale occurred. When the seller finances part of the purchase price by means of a wraparound mortgage, the seller becomes liable for the tax on the gain only as to the *principal* amount which the seller actually receives during any given tax year. Thus, the gain is taxable only as the seller receives the installment payments on the mortgage, and then only as to the principal portion thereof.

of gain for which tax is payable each year under the installment tax reporting method can be decreased.

Prior to changes in the tax laws effective in 1988, another benefit to a seller using wraparound financing was that the wraparound structure could be used to generate a higher sales price with a correspondingly lower interest rate. As a result, the amount of capital gain, which in 1984 was taxed at a lower rate than ordinary income, was increased, while the future amount of interest income, which is taxed as ordinary income, was decreased.

A wraparound mortgage gives the lender better control over the transaction and the opportunity to provide financing at a lower cost than rates prevailing in the marketplace, thus making the property more attractive than other properties offered for sale using conventional financing. Moreover, wraparound financing may allow the lender to avoid the cost of prepayment penalties which may be payable to the underlying mortgagees.

CCRI agreed to the wraparound financing structure as a result of its own tax considerations. CCRI benefitted from structuring the financing as a wraparound rather than a second mortgage because CCRI obtained the favorable tax treatment described above, which resulted from a reduced gross profit ratio and a reduced amount of gain recognized by CCRI.

Under the agreement between Club and CCRI, Club was not obligated to make payments of principal and interest on the underlying first mortgage notes or any payments on the ground lease. Club has no direct obligation to or contractual relationship with the first mortgagees.[20] Club signed a promissory note payable to CCRI for $22,000,000, which amount included the amount of first mortgage debt. The balance of the Note and the schedule of Club's payments to CCRI are unaffected by payments made or not made by CCRI to the

underlying mortgagees or CCRI's discharge of any underlying obligation upon its maturity.

Although the wraparound financing may have been more attractive to CCRI before the changes made to the tax laws with the enactment of the Tax Reform Act of 1986, reformation of the agreement between Club and CCRI by this court to convert it now to the second mortgage agreement CCRI would like to have bargained for in 1984 is inappropriate. *In re Hagel Partnership*, 40 B.R. 821 (Bankr.D.C.1984). *See also, Lomas Mortgage USA, Inc. v. Elmore*, 94 B.R. 670 (Bankr.C.D.Cal.1988) (adequate protection is designed to protect Fifth Amendment property rights, not contract rights). Just as the Bankruptcy Code, as it may be amended, is tacitly a part of every contract,[21] so is the Internal Revenue Code. Furthermore, CCRI has consistently characterized its loan as a wraparound mortgage, as evidenced by CCRI's own loan documents, its tax treatment of its gain on the sale, its proof of claim and its ballots rejecting the Plan. The risk of diminution of its wrap equity was inherent in the original agreement with Club embodied in the wraparound Note.

The "essence of wrapness"[22] dictates a result in this case different from those reached in the traditional second mortgage situations. Because the debt of Club to CCRI and the debt of CCRI to the underlying mortgagees are independent of and unaffected by each other, CCRI is not entitled to protection of its wrap equity.

■ Therefore, except with respect to the portions of the Postpetition Payments paid for property taxes, the principal amount of CCRI's claim should be reduced in an amount equal to the Postpetition Payments. That amount is approximately $4,325,972 less the tax escrow payments of $512,578 or $3,813,394.[23] In addition to allocation of the Postpetition Payments to

---

20. The Property is subject to the debt owed the first mortgagees by virtue of the first mortgagees' security interest in the Property, however.

21. *See, In re Jersey Island Packing Co.,* 138 F. 625 (9th Cir.1905).

22. So characterized by Club.

23. *See* footnote 10, *supra.*

reduce the principal amount of CCRI's claim, Club also seeks to reduce the amount of CCRI's claim by $311,731, which represents the interest Club would have earned on the Postpetition Payments if they had not been made—lost opportunity costs in reverse. Club's contention, however, is without legal foundation and without merit. The Postpetition Payments were made pursuant to a cash collateral order entered by consent. Additionally, the Postpetition Payments functioned as adequate protection for CCRI against deterioration in the value of its collateral.

Thus, after application of the Postpetition Payments on the Effective Date as set forth above, CCRI's debt will include that interest which accrued on CCRI's Note prepetition in the amount of $691,000, and the resulting amount, plus 10% interest compounded annually, will be paid upon maturity of the modified CCRI loan. The principal balance of the CCRI Note, as modified under the Plan, is estimated to be $18,186,606.[24]

### 2. NEGATIVE AMORTIZATION

Pursuant to 11 U.S.C. § 1129(a)(8), a plan may be confirmed if all classes have either accepted the plan or are unimpaired under the plan. Where a creditor is impaired and has not accepted the plan, the plan may be confirmed if it meets the "cram down" requirements set forth in 11 U.S.C. § 1129(b), i.e. that the plan does not discriminate unfairly and is fair and equitable. CCRI contends that the Plan is not fair and equitable because the stream of payments to CCRI provided for in the Plan results in negative amortization during the first eight years of the Plan.

Negative amortization, which is also described as "deferral of interest" and "accrual of interest," can be defined as a provision wherein part or all of the interest on a secured claim is not paid currently but instead is deferred and allowed to accrue.

The accrued interest is added to the principal and paid when income is higher or when the collateral is sold. *In re Century Investment Fund VII Limited Partnership*, 96 B.R. 884 (Bankr.E.D.Wis.1989). The overall rate of interest to be paid on the claim is referred to as the accrual rate. The rate to be actually paid on a monthly basis is referred to as the pay rate. The difference between the two represents the extent of negative amortization.

The Plan provides for an accrual rate of interest on CCRI's claim at 10% per year. The stream of payments to CCRI, however, will result in a pay rate of 8% with the 2% balance accruing to be paid, together with the remaining balance of the principal, at the end of the 10–year term of the Plan. As a result of this pay-and-accrue feature of the Plan, the balance due CCRI gradually increases by approximately $1.7 million during the first seven years of the term of the Plan.[25]

Although negative amortization is not *per se* inequitable, *In re Anderson Oaks Limited Partnership*, 77 B.R. 108 (Bankr.W.D.Tex.1987); *In re Century Investment Fund VII Limited Partnership*, 96 B.R. 884 (Bankr.E.D.Wis.1989), negative amortization ·is highly suspect when evaluating a plan's compliance with the cramdown requirements. In the case of *In re Spanish Lake Associates*, 92 B.R. 875 (Bankr.E.D.Mo.1988), the court set forth the following factors to be considered in determining whether deferred post-confirmation interest satisfies the fair and equitable requirement of § 1129(b):

1. The length of the post-confirmation deferral of interest;

2. The amount of interest to be deferred after confirmation;

3. The amount of principal and interest deferred and capitalized after confirmation;

---

**24.** This amount is subject to further adjustment for actual Postpetition Payments made by Club after July, 1989 and before the Effective Date.

**25.** Although the balance due will increase as a result of the accrual of interest, as a result of the allocation of the Postpetition Payments, discussed above, the outstanding balance due CCRI never exceeds the amount of CCRI's allowed claim of $22,691,000.

4. The ratio of debt to value of collateral during the term of the deferral; and

5. The nature and quality of the collateral, including consideration of whether the value of the collateral is appreciating, depreciating or remaining relatively stable.

*Id.* at 878. In the instant case, the term of the original Note is being extended five years. Also, although the initial loan to value ratio will be approximately one to one (1:1), Club's projected value of the Property at the end of the Plan's term provides CCRI with a substantial equity cushion.

The cases in which negative amortization was found to be inequitable differ from the instant case. In *Spanish Lake*, 92 B.R. 875, the debtor proposed to accrue interest at the rate of 10% but would pay in the first year only 2%, gradually increasing to 10% in the seventh year. The deferred interest would then be amortized over a thirty-year period with a balloon payment in the eleventh year of the plan. None of the deferred interest balance would be reduced until the balloon payment in the eleventh year. Additionally, the quality of the collateral in *Spanish Lake* was such that the debtor's projections for increased income over the term of the Plan were unreliable. In the instant case, the term of CCRI's loan is extended only five years beyond its original maturity date under terms very similar to those in the original Note. Additionally, Club's projections in support of the feasibility of the Plan are reasonable. *See, infra,* at pages 404–05.

In the case of *In re Anderson Oaks Limited Partnership*, 77 B.R. 108 (Bankr. W.D.Tex.1987), a substantial portion of the debt was unsecured. In the instant case, the unsecured portion of CCRI's debt is largely eliminated by the allocation of the Postpetition Payments. Additionally, the creditor's claim in *Anderson Oaks* would not be paid in full for thirty years. The court found that virtually all the risk of failure of the debtor's plan was on the creditor.

In the case of *In re Memphis Partners, L.P.*, 99 B.R. 385 (Bankr.M.D.Tenn.1989), the creditor was substantially undersecured as of the effective date of the plan. In the instant case, after allocation of the Postpetition Payments to reduce CCRI's principal balance, the remaining balance due is fully secured and is projected to remain so,[26] even with the accrual of post-confirmation unpaid interest, over the term of the Plan. Additionally, the prepetition unsecured interest claim in the instant case is treated as if fully secured for the purposes of ultimate payment.

Two of the unconfirmed negative amortization plan cases involved construction loans extended into permanent financing, such a qualitative difference in treatment as to be facially objectionable. These cases differ in that significant respect from the instant case. In the case of *Federal Savings and Loan Ins. Corp. v. D & F Construction, Inc.*, 865 F.2d 673 (5th Cir.1989), the term of the original loan, a construction loan with no negative amortization feature, was extended fifteen years. The creditor had made an election to have its claim treated as fully secured under § 1111(b). In the case of *In re Edgewater Motel, Inc.*, 85 B.R. 989 (Bankr.E.D.Tenn.1988), the debtor's plan provided for a 10–year extension of the term of a matured construction loan. In none of the other cases cited above wherein negative amortization was found to be inequitable did the original transaction between the parties include a negative amortization feature. In the instant case, however, the original agreement between the parties provided for negative amortization over the life of the loan.[27]

Most of the decisions in which negative amortization was found to be inequitable were based on the finding that the creditor should not have to bear the risks which occur as a result of negative amortization when the creditor did not bargain for those risks when initially lending the funds. The risk which the creditor bears is that after

---

**26.** See the discussion relating to feasibility, *infra* at page 406.

**27.** For a description of the terms of the original agreement, *see, supra* at pages 388 and 389.

its claim has increased as a result of accrual of interest, the creditor may find itself without adequate security if the debtor's plan fails. Such a risk is often substantial and rarely will a plan which provides for negative amortization be approved by a bankruptcy court. In the unusual case, however, circumstances may coalesce so that the risk created by negative amortization is not inequitable.

Negative amortization is not a common feature of traditional institutional financing arrangements. In the instant case, however, negative amortization was a risk originally bargained for by CCRI. The Plan extends that risk for five years but for a reduced principal amount as a result of the allocation of the Postpetition Payments and for a slightly higher interest rate than that provided in the original Note. When that reduction of the principal amount is combined with the projected increase in value of the Property over the term of the Plan, the risk which CCRI bears as a result of negative amortization is no greater than that it freely accepted when the Property was transferred in 1984. Therefore, the negative amortization proposed in the Plan is fair and equitable.

### 3. THE ABSOLUTE PRIORITY RULE

■ As discussed above, when an impaired creditor fails to accept a plan, the plan may nevertheless be confirmed if the requirements of 11 U.S.C. § 1129(b) are satisfied. Section 1129(b)(2)(B) sets forth that, with respect to a class of unsecured claims, the plan must provide:

> ... that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or ... the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property.

CCRI contends Club's general and limited partners will retain their interests in Club while CCRI and the general unsecured creditors will not receive payment in full as of the Effective Date.[28] As a result, CCRI argues, the absolute priority rule of § 1129(b)(2)(B)(ii) is violated. CCRI's argument cannot succeed, however. First, Class 7, which is comprised of Club's general unsecured creditors, although impaired, accepted the Plan. Therefore, § 1129(b) is not applicable to Class 7.

■ Second, as discussed below at page 35, with respect to CCRI, the Plan satisfies the requirement of § 1129(b)(2)(B)(i) that CCRI receive "property of a value, as of the effective date of the plan, equal to the allowed amount of such claim." The allocation of the Postpetition Payments, together with the present value of the stream of payments provided by the Plan, results in payment equal to CCRI's claim. Therefore, § 1129(b)(2)(B)(ii) is inapplicable.

### 4. CLASSIFICATION

CCRI makes a somewhat complex argument with respect to classification. First, CCRI contends that because it is undersecured, the unsecured portion of its claim should be included with the unsecured trade creditors' claims in Class 7. Because CCRI's unsecured claim exceeds the total of the other unsecured claims in Class 7 and because it would vote against the Plan, Club would have no impaired class which accepted the Plan and, thus, Club could not avail itself of the cramdown provisions of § 1129(b). To sustain the latter portion of this argument, CCRI also contends that Classes 3, 4, and 5 are not impaired, although characterized as such by the Plan.

With respect to the latter argument, CCRI argues that Class 3 (the claim of Sun Life) and Class 5 (the claim of Transamerica) are not impaired merely by the addition of a requirement to provide Club with written notice of a default by CCRI and with an opportunity to cure the default. CCRI argues Class 4 (the claim of

---

**28.** CCRI also objected to Section 7.01 of the Plan, which provides for the release of various entities from liability as general partners, co-

makers, or guarantors of Club. Club agreed to delete that provision from the Plan, as provided for *infra,* at page 409.

American Savings Bank) is not impaired by the notice requirement plus an extension of its term because the extension will result in its receiving more than 100% of its claim.[29] CCRI's argument that these changes in the terms of the notes of the underlying secured creditors are too minor to constitute impairment under § 1124, however, is without merit.

Any alteration in a creditor's legal rights or privileges constitutes impairment. *In re Barrington Oaks General Partnership*, 15 B.R. 952 (Bankr.D. Utah 1981). An alteration which is clearly intended only to create an impaired class to vote in favor of a plan so that a debtor can effectuate a cramdown, however, will not be allowed. *In re Meadow Glen Limited*, 87 B.R. 421 (Bankr.W.D.Tex.1988); *In re U.S. Truck Co., Inc.*, 800 F.2d 581 (6th Cir.1986). No such intent by Club is apparent. The alteration providing for notice of default is logical, given that by virtue of the wraparound note, Club must depend upon CCRI to maintain the payments to the underlying debt. Additionally, even if Classes 3–5 were deemed unimpaired, Class 7 remains clearly impaired and has accepted the Plan.

CCRI's argument that its unsecured claim should be included in Class 7 with the unsecured trade creditor's claim is likewise without merit. Although a debtor may not place dissimilar claims in the same class, a debtor may place similar claims in different classes as long as the classification is not designed for abusive or manipulative purposes. *In re Atlanta West VI*, 91 B.R. 620 (Bankr.N.D.Ga.1988); *In re AG Consultants Grain Division, Inc.*, 77 B.R.

665 (Bankr.N.D.Ind.1987); *In re Jersey City Medical Center*, 817 F.2d 1055 (3d Cir.1987). In the instant case, the only similarity between CCRI's unsecured claim and the claims of those creditors in Class 7 is that they are all unsecured. In both amount and character, they differ significantly. Indeed, if Club had classified the claims together, an objection based on their dissimilarity might have been sustainable.[30]

The Plan provides for extension of the term of the loan of American Savings Bank for two years with payment of its contract rate of interest of 13.25%. CCRI argues that such a provision discriminates unfairly because 13.25% is an above-market rate, which would result in receipt by American Savings Bank of more than 100% of its claim, and is above the 10% rate which the Plan proposes to pay CCRI on its claim.

The American Savings Bank note is scheduled to mature November 30, 1990.[31] On that date a balloon payment of $2,205,-796.44 will be due from CCRI.[32] Thus, while the two-year extension will result in American Savings Bank receiving two additional years of interest payments, which must be paid by CCRI, the two-year extension benefits CCRI by allowing it more time within which to accumulate the cash it needs to meet the balloon payment due, if the note is extended, in 1992. Additionally, the principal balance due on maturity will be reduced as a result of the additional two years of payments. Consequently, rather than discriminating unfairly against CCRI, the additional interest paid as a result of the two year extension is offset by the

---

29. CCRI also argues the Plan's treatment of American Saving Bank's claim discriminates unfairly. This argument is addressed below.

30. To require Club now to create a separate class for CCRI's unsecured claim would be an exercise in futility, especially in light of the allocation of the Postpetition Payments. On the other hand, if CCRI's unsecured claim was to be treated the same as Class 7, then theoretically, Club might have chosen to pay CCRI only 80% of its unsecured claim by allocation of the Postpetition.Payments. Club chose, however, to pay CCRI 100% and treat it as a secured creditor.

No other creditor objected to the proposed treatment for CCRI.

31. Sun Life's note matures in 2002 and Transamerica's note matures in 1998.

32. CCRI's obligation to American Savings Bank is the result of a modification, in 1984, of a preexisting note between CCRI and Empire Savings Bank, which was scheduled to mature November 1, 1988. The modification extended the maturity date, increased the interest rate from 9.5% to 13.25%, and increased the monthly payments from $23,810.42 to $29,700.27.

benefit to CCRI of postponing the maturity date of American Savings Bank's note.

■ The Plan's modification of the American Savings Bank note, however, appears to conflict with Club's "essence of wrapness" argument. If the underlying notes are not obligations of Club and are irrelevant to Club's obligation to CCRI, how can Club justify the modification of those notes in the Plan? Although the underlying notes, which are secured by deeds to secure debt on certain portions of the Property, constitute liens on the Property, Club has correctly stated, repeatedly, that Club is not a party to the notes and that the terms of the underlying notes have no present relationship to the obligation of Club to CCRI. Although the modifications to the underlying notes are relatively minor, the creditors have accepted the Plan and thereby consented to their impairment. The modifications to Classes 3–5 do not appear to harm CCRI; the notice provisions are logical protections for Club. Nevertheless, the extension of the Class 4 note constitutes an impairment of the Class 4 note which materially affects CCRI. If CCRI refuses to consent to the inclusion of Classes 3 through 5 in Club's Plan, those provisions should be deleted.[33]

### 5. DISCOUNT RATE

With respect to a class of secured claims, the plan must provide:

(i) (I) that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and

(II) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property; ...

(iii) for the realization by such holders of the indubitable equivalent of such claims.

11 U.S.C. § 1129(b)(2). CCRI argues that the 10% interest rate which the Plan proposes to pay will not provide deferred cash payments totaling the present value as of the Effective Date of CCRI's allowed secured claim. CCRI presented extensive expert testimony concerning the conventional interest rate which would be applicable, if obtainable, to a loan such as that proposed by Club with respect to CCRI's claim. CCRI contends no less than 15% is required to guarantee that it will receive 100% of the present value of its claim.

In the case of *United States v. Southern States Motor Inns, Inc.*, 709 F.2d 647 (11th Cir.1983), the Eleventh Circuit set forth factors to be considered in determining an appropriate discount interest rate to assure a creditor who is required to accept deferred payment of its claim that he receive the full present value of its claim. "[T]he court must consider the prevailing market rate for a loan of a term equal to the payout period, with due consideration of the quality of the security and the risk of subsequent default." *Id.* at 651.

■ Other courts consider, in addition to the market rate, the rate of interest set forth in the contract between the parties. In *Southern States*, the claim under consideration was an unsecured priority tax claim; thus, there was no contract rate for the court to consider. In the case of *In re Corley*, 83 B.R. 848 (Bankr.S.D.Ga. 1988), the court recognized that the appropriate discount interest rate is the market rate in similar loan transactions but that rate is limited to not more than the contract rate. The *Corley* court acknowledged that a creditor must be guaranteed receipt of the full benefit of its bargain but also conceded that "care must be taken to prevent the creditor from profiting from Debtor's filing." *Id.* at 852. *Accord, In re Kuljis Seafood Co., Inc.*, 73 B.R. 659 (Bankr.S.D.Miss.1986); *Cardinal Federal*

---

**33.** Deletion of the Plan's provisions relating to the underlying creditors should not affect efficacy of the Plan provisions with respect to cram down because Class 7 remains as an impaired class which has accepted the Plan. *See* discussion, *supra,* beginning at page 400.

*Savings and Loan Association v. Colgrove,* 771 F.2d 119 (6th Cir.1985); [34] *In re Mitchell,* 77 B.R. 524 (Bankr.E.D.Pa.1987); *In re Patel,* 21 B.R. 101 (Bankr.M.D.Fla. 1982). Therefore, although the contract rate is not determinative of the discount rate, it is relevant in determining the appropriate discount rate.

In the instant case, Club proposes to pay a discount interest rate of 10% over the 10–year term of the Plan. The 10% rate is slightly higher than the weighted contract rate of 9.45% [35] but is lower than the market rate for conventional financing under the terms set forth in the Plan. Club argues that the seller-financing characteristics of the original agreement between Club and CCRI should be considered and should influence the decision concerning whether the 10% rate proposed by Club is an appropriate discount interest rate.

As described in some detail above, the sale of the Property by CCRI to Club in 1984 was financed by CCRI. The interests of the seller and, thus, the terms which are considered acceptable for seller financing such as that involved in Club's purchase of the Property from CCRI, frequently differ from the interests of a conventional lender [36] in non-seller financed loans. A conventional lending institution or other non-seller entity making a mortgage loan is interested in its yield on the loan amount and the risk it will incur in connection with the loan in comparison with the market interest rate. The conventional lender gauges its risk against more objective criteria, such as loan-to-value ratio or debt service coverage.

As a general rule, however, the interests of the seller-lender differ from those of the conventional lender. Because the seller-lender will essentially be paying itself the funds it is lending to the purchaser, the seller-lender is influenced by three aspects of the transaction, both as seller and as lender. The seller-lender is interested in the purchase price, the downpayment, and the terms of such financing as may be necessary to facilitate the sale. A conventional lender's interest in the dynamics between the purchase price and the financing terms is usually different in character because its primary interests in the property tend to focus upon yield and security for its loan.

The seller-lender often has more flexibility than a conventional lender in arranging financing for a purchaser. In seller-financed loans, the yield expected by the seller is calculated by including both the proceeds of the sale and the proceeds from the loan. The conventional lender receives a yield only from the loan. Seller financing can benefit the seller of the real estate by permitting the seller to obtain a higher sales price offset by a lower interest rate.

In 1984, a higher sales price offset by a lower interest rate was attractive as a result of the tax laws in effect at that time. A higher sales price resulted in higher capital gain which would be taxed at the lower capital gain tax rate. The interest income, which would be paid to the seller in smaller increments over a 10 year period, would be taxed at the higher tax rate for ordinary interest income. Thus, the seller could manipulate sale terms to minimize the tax consequences of the sale. As a result of the attraction of maximizing the capital gain, of which only 40% was then subject to the federal income tax,[37] interest rates on

---

**34.** The standards concerning what discount rate is required to assure a creditor's receipt of present value of its claim are the same in Chapters 11, 12 and 13. *In re Corley,* 83 B.R. 848.

**35.** The Note provided that Club pay CCRI at an interest rate of 8.89771% for the first seven years of the Note and then at a rate one point higher than the prime rate, with a minimum interest rate of 12% and a maximum rate of 17% during the last three years of the term of the Note. *See, supra,* pp. 388–89.

**36.** The term "conventional" refers to banks, saving and loan associations, credit unions, mortgage companies and other such institutions which are in the business of lending money for the purchase of real estate.

**37.** Through the 1986 tax year, the Tax Code allowed a 60% deduction from the income resulting from a long-term capital gain, which resulted in only 40% of the income being subject to income tax. 26 U.S.C. § 1202 (repealed). The maximum tax rate for individuals was 50%; therefore, the net capital gain was taxed at a maximum rate of 20%. This favorable treat-

seller-financed notes were generally lower, sometimes by 2 to 3 percent, than interest rates for conventional non-seller financed notes.

The terms on which CCRI initially offered the Property for sale in 1984 provided for a purchase price of $26,000,000 with a wraparound purchase money note of $19,-500,000 at an interest rate of 10% for seven years. Club and CCRI, however, negotiated (1) an increase in the purchase price, (2) an increase in the amount of the wraparound Note to $22,000,000, (3) an increase in the term of the Note from 7 years to 10 years, and (4) a reduction in the interest rate of the Note. The negotiation of the purchase price and interest rate agreed upon by Club and CCRI in 1984 was typical of the type of negotiation which occurs in seller-financed transactions.

The CCRI loan, as modified by the Plan, is a ten-year interest-only loan with no principal amortization, no personal guaranty, and a debt coverage ratio of approximately 1:1. The original Note had similar attributes. The 1984 Note was a ten-year, interest-only loan with negative amortization, no personal guaranty, and a high debt coverage ratio.

CCRI provided expert testimony that the market rate for a $19,000,000 loan on the Property would be 15% or higher. A loan on terms such as those provided by the modified CCRI loan under the Plan, i.e., financing for a debt of approximately $19,-000,000 secured by the Property, would not be available in the marketplace on a new first mortgage basis. Terms such as those provided in the original transaction in 1984, however, would also have been difficult, if not impossible, to obtain from a conventional lender.

The 10% interest rate proposed for the modified CCRI loan under the Plan is both higher than the effective rate of CCRI's 1984 loan and closer to current conventional first mortgage rates than was the 1984 loan. The effective rate of interest of CCRI's purchase money wraparound Note in 1984 was approximately 9.45%. The

market rate for a conventional first mortgage on multifamily property in November 1984 was in the range of 12% to 14%. Thus, the interest rate on CCRI's original Note was 2.5 or 3 percent lower than first mortgage rates from conventional lenders in November 1984. At the time of Hearings, expert testimony showed that recent multifamily interest rates (as of February 1989) ranged between 10% and 12.5%, averaging 11 to 11.25%. Therefore, extrapolating from a comparison of the terms of CCRI's loan and the market interest rates in 1984, current seller-financed interest rates could be as low as 8%.

Club proposes to pay interest at 10% over the term of the Plan, which extends the term of the original Note by five years. CCRI's choice to finance the original purchase of the Property by Club, and the terms of that transaction, was made to maximize the benefits of the transaction for CCRI. Many of those benefits have already been enjoyed by CCRI. The imposition of a conventional market interest rate upon an unconventionally financed transaction would result in a windfall to CCRI by conferring upon it an interest rate significantly different in character than that for which it originally bargained. Club's proposed payment of a 10% discount rate of interest is higher than the original contract rate. It is also higher than the current interest rate for seller-financed transactions would be if the same formula used in the 1984 transaction were used today. Thus, Club has included a premium for the higher risk involved as a result of the modifications of the Note included in the Plan. Club's proposed discount rate is fair and equitable and will insure that CCRI receives 100% of the present value of its claim.

### 6. FEASIBILITY

■ CCRI contends the Plan is not feasible because the Project will neither generate sufficient income during the term of the Plan to make the payments to CCRI provided in the Plan nor will the Property

ment for long-term capital gains was repealed for tax year 1987. The maximum tax rate for

long-term capital gains is now 28%. 26 U.S.C. §§ 1211, 1212.

appreciate in value during the term of the Plan to provide sufficient value in the tenth year to pay to CCRI the balance of the principal and accrued interest provided in the Plan. Whether Club's projections of future income and expenses on the Project are reasonable is relevant to determining whether the Plan is feasible.

The Plan proposes to pay CCRI's claim in two stages. First, on the Effective Date, Club's Postpetition Payments will be allocated to reduce the principal of CCRI's claim. The remaining amount of CCRI's claim would become the modified principal balance of a modified note by Club to CCRI, with payments to be made over a ten-year period. While the Plan requires Club to raise additional capital from limited partners or outside investors, the main source of repayment over the ten-year term of the Plan will be net operating income from the Project itself.

The reasonableness of Club's projections of income and expenses on the Project must be evaluated by examining the three stages of Club's projections: (1) the projected income, expenses, and resulting net cash flow shown for Year 1 of the Plan; (2) the projected 3% increases in income and expenses in Years 2 and 3 of the Plan; and (3) the projected 5% increases in income and expenses in Years 4 through 10 of the Plan. The income projected by Club for Year 1 under the Plan is supported by reasonable assumptions which were explained in detail in Mr. Baker's testimony and in the disclosure statement and its exhibits. The gross potential income figures for the Project for the months beginning in September 1988, and continuing through the time of the hearing, increased significantly to the point where Club's income performance is already very close to that projected for Year 1 under the Plan. This sustained increase over several months lends credence to Mr. Baker's opinion of a strengthening market and compares favorably with the relative flatness in the Project's income over the last few years.

The expenses projected by Club for Year 1 of the Plan are reasonable in light of the recent operating history of the Project. For example, the property tax expense for Year 1 has been estimated to be $300,000, compared to an actual property tax expense of $286,660 in 1988. The insurance expense for Year 1 of the Plan is projected to be $72,000, compared to an actual expense in 1988 of $71,746. The total expenses, including operating expenses and capital improvement expenses, for Year 1 of the Plan are projected to be $1,695,120, compared to total expenses of $1,573,348 in 1988. Therefore, pursuant to all the evidence adduced at confirmation, the expenses projected by Club for Year 1 of the Plan are reasonable estimates of the actual expenses that will occur on the Project. The projected operating income and expenses for Year 1 under the Plan also are reasonable in comparison to the stabilized income and expense statements submitted in five appraisals during these Chapter 11 proceedings.

Club also projected and budgeted for extraordinary improvements in the amounts of $200,000 for re-roofing the Project and $150,000 for repainting the exterior of the Project. The majority of the roofs at the Project need to be replaced within 24 to 36 months. Club proposes to allocate $140,000 for roof repair and replacement in the first year of the Plan and $60,000 in the second year. The Project's exterior will be repainted in the fourth and fifth year under the Plan for a total cost of $150,000 consisting of $50,000 in the fourth year and $100,000 in the fifth year. The amounts budgeted by Club for extraordinary improvements are reasonable and sufficient to cover the cost of such improvements.

The Atlanta apartment market is cyclical and appears to have reached bottom recently. The market is, accordingly, beginning to strengthen. From 1977 to 1982 the rental market was rebounding, and during that time rental concessions were evaporating and rental increases as large as 10 to 12% in a year were experienced. From 1982 to 1987, a significant amount of new construction occurred in the apartment market caused by, among other things, decreasing interest rates and attractive tax-exempt financing. The market became over-built,

occupancy suffered, and rental incomes remained flat as they have at the Project for the last three years.

Currently, fewer construction starts in multifamily housing are occurring; interest rates have been higher; tax-exempt bond financing is no longer available; turnover in tenants who move from the Project to purchase homes is lower; and the resale market for apartment projects weakened, resulting in less construction of competing projects. Over the next several years construction starts of multifamily housing are likely to be lower than historical averages, which will give the market an opportunity to tighten. Occupancies should increase. Rental concessions should disappear and rental rates should increase. During Years 2 and 3 of the Plan, the market should continue to strengthen further; consequently, resulting 3% increases in income, expenses, and capital improvements during that period of time are reasonable. Higher percentage increases are predicted for Years 4 through 10 under the Plan as a result of fewer construction starts and less competition, as well as growing demand for apartments as the population in metropolitan Atlanta grows. In some years of the Plan, 6–10% rental increases may be experienced, although in some years it may also be less than the predicted amounts. The Project appears likely to experience, however, an average annual increase of 5% in net income, as projected for Years 4–10 under the Plan.

From 1978 to 1988, the average annual increase in revenues on the Project was 4.28%. Assuming a constant growth factor of 4.28% per year in the Project's net operating income over the term of the Plan, Club has the ability to pay the minimum debt service and cash flow payments for each year under the Plan, and the Property will have sufficient resale value to discharge the total amount owed to CCRI at the conclusion of the Plan.

CCRI's expert witness testified that an average increase of only 3.55% per year in the Project's net operating income would generate sufficient funds for Club to pay off the CCRI debt as proposed in the Plan. With a modified principal balance of $18,758,000 and a capitalization rate of 9.75%, he further testified that with a 3.55% annual compounded growth rate, Club's net income over the ten-year period would break even with the CCRI debt at the end of ten years. Even if the Project did not achieve the net cash flow shown in Club's ten-year projections, attainment of an average growth rate of at least 3.55% appears reasonably likely. Therefore, Club's projections are reasonable and the projected cash flow will be sufficient to cover the required debt service payments to CCRI during the term of the Plan. Additionally, Club's projections will be sufficient to fund repairs and improvements, and the current physical condition of the Project does not adversely affect the feasibility of the Plan.

With respect to the ultimate resale value of the Property at the end of the Plan's ten-year term, reasonably anticipatable proceeds from the sale of the Property will be well in excess of the remaining amount of CCRI's claim at that time. Based on Club's projection of net operating income in Year 10 of $2,659,743 and applying a capitalization rate of 9.5%, a projected value in the tenth year would be approximately $27,997,000. Using a capitalization rate of 9% would result in a value of approximately $29,552,000. Using a capitalization rate of 9.75%, the future value would be approximately $27,279,000.

The use of ten-year projections of cash flow and resale value are necessary and reasonable in evaluating the feasibility of a reorganization plan designed for a ten-year period. While 10 years is more than that with which most experts are extremely comfortable, in appropriate, if rare, circumstances, ten-year projections are not unreasonable. Much can happen in years 6–10. However, the Project is stable, attractive, with large grounds and an excellent location. It has not been, and does not appear likely to become, a "distressed" property which did or will be likely to languish until only experts in distressed properties are interested in its purchase. Accordingly, the risk to the lenders that the ten-year projections are unrealistic is not unreason-

able under the particular circumstances of this case.

The Plan requires Club to raise a minimum of $487,500 in cash and notes from limited partners or outside investors. Under Club's projections, the Plan would be feasible without this additional capital infusion from the limited partners or new investors in Club. Additionally, the Plan provides that unless sufficient commitments are obtained within 60 days after confirmation, Club will not oppose a further motion for relief from the automatic stay. The testimony of Mr. Baker evidenced that historically his efforts to obtain capital from the limited partners related to IRG II and outside investors have been successful. The tentative efforts expended since the filing of Club's bankruptcy petition have been encouraging. To the extent that the feasibility of the Plan may be enhanced by the raising of these funds, the Court finds that it is reasonably likely that the funds can be raised as provided in the Plan.

With respect to the amount of cash which will be available to Club to perform its obligations under the Plan as of the Effective Date, Club has approximately $366,000 in capital contributions, including accrued interest, owing from its general partners, less amounts previously expended pursuant to court orders for interim administrative expenses. Adding Club's cash on hand to these capital contributions, approximately $390,000 in liquid funds are available to Club plus an amount of at least $37,500 to be received after confirmation from limited partners or new investors pursuant to the Plan. An additional amount of approximately $30,000, which is currently held by Club's general partners but is not owed as capital contributions, can and should be made available to Club so that a total of approximately $457,000 is available. No unpaid income taxes or property taxes and no other administrative expense or priority claims, except such amounts as the Court may award as compensation or reimbursement for Club's counsel pursuant to 11 U.S.C. §§ 330 and 331 are due and owing by Club.[38] Thus, the funds available to Club will be sufficient to pay 80% of other Class 7 claims[39] and Club's other obligations under the Plan as of the Effective Date, to fund any negative cash flow in Year 1 of the Plan, and to pay for any capital improvements or deferred maintenance items not anticipated by Club in its projections of operating expenses, capital improvements or extraordinary expenses.

## 7. LIQUIDATION ANALYSIS

■■■ Pursuant to § 1129(a)(7), each member of an impaired class who has not accepted the Plan must:

> ... receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date[.]

In the instant case, CCRI and one creditor holding an unsecured claim classified in Class 7 have not accepted the Plan. Therefore, a liquidation analysis is necessary to determine whether the Plan provides that the non-accepting creditors will receive more than they would receive if Club were liquidated pursuant to Chapter 7. The

38. As of the date of entry of this order, as a result of three applications by Club's attorneys for interim compensation, a total of $421,791.62 has been allowed by this court for attorney fees and expenses less prepetition advances of $16,175.19, which results in a total of $405,616.43. A major portion of the compensation was for time expended in connection with the adversary proceeding filed by Club against CCRI, Adversary Proceeding No. 87–0296A, and CCRI's motion for relief from stay, both of which involved lengthy and complex pleadings and proceedings and which almost completely consumed the first two years of the period during which this case has been pending.

Debtor's attorneys have been allowed immediate payment of only 90% of the attorney fees. As a result, the estimated amount for attorney fees and expenses currently paid or payable by Club is $365,904.13. Upon the filing of an application for final compensation, all compensation awarded in the instant case will be reviewed to determine the propriety of payment of the unpaid 10%, as well as any additional compensation requested.

39. Eighty percent of the Class 7 unsecured claims equals $9,322.57.

Plan provides that CCRI will receive 100% of its allowed claim of $22,691,000. The Plan provides that unsecured creditors in Class 7 will receive 80% of their claims.

Several witnesses testified concerning the liquidation value of the Property. Testimony from the appraiser set the liquidation value at $14,600,000. The appraiser stated that he computed this "liquidation" value based upon a "distress price" at a forced sale of the Property. Other expert testimony was that the liquidation value of the Property is less than current fair market value. The fair market value of the Property, discussed above, is at least $18.75 million.

A forced sale of real property usually results in realization of significantly lower values than the fair market value which might be realized over time. *See, In re Neff,* 60 B.R. 448 (Bankr.N.D.Tex.1985). The liquidation value of the Property may be less or significantly less than the fair market value of the Property. A liquidation sale of the Property which resulted in receipt of 90% of its fair market value would bring only $16,875,000; receipt of 95% of its fair market value would bring $17,812,500. Using the latter value, CCRI would receive less than the amount of its secured claim, even with allocation of the Postpetition Payments to its principal balance. Unsecured creditors would receive nothing. Therefore, both CCRI and the unsecured creditors of Club would receive under the Plan property of a value greater than the value of the property which could be received upon liquidation.

## 8. GOOD FAITH

CCRI contends the Plan was not filed in good faith. CCRI's argument, however, is contingent on its other objections to the Plan. CCRI argues that because the Plan fails to satisfy the standards set forth in § 1129, the Plan could not have been proposed in good faith. Therefore, because Club has prevailed with respect to each of CCRI's objections, CCRI's good faith argument must also fail. The good faith argument would probably be superfluous in any case because if any of CCRI's objections to the Plan had been sustained, Club's reorganization probably could not have been accomplished.

## OTHER CONFIRMATION ISSUES

The documents submitted by Club reflecting the proposed note and security deed modifications with respect to CCRI and the three first lienholders are satisfactory and conform to the requirements of the Plan.

The Plan complies with the applicable provisions of the Bankruptcy Code. Club, as proponent of the Plan, has complied with the applicable provisions of the Bankruptcy Code. The Plan has been proposed in good faith and not by any means forbidden by law.

Any payment made or to be made by Club for services or for costs and expenses in or in connection with this case, or in connection with the Plan and incident to this case, has been approved by, or is subject to the approval of, the Court as reasonable.

The requirements of 11 U.S.C. § 1129(a)(5)(A) are not applicable to this Plan, because no "individual proposed to serve, after confirmation of the Plan, as a director, officer, or voting trustee of the debtor, an affiliate of the debtor participating in a joint plan with the debtor, or a successor to the debtor under the plan." 11 U.S.C. § 1129(a)(5)(A).

The Plan discloses the identity of insiders who will be employed or retained by the reorganized debtor and the nature of any compensation for such insider.

Club is not a debtor having "rates" under the jurisdiction of any governmental regulatory commission, as referred to in 11 U.S.C. § 1129(a)(6).

This case involves no claims of the types specified in 11 U.S.C. §§ 507(a)(2), 507(a)(3), 507(a)(4), 507(a)(5), 507(a)(6), and 507(a)(7).

All fees payable pursuant to 28 U.S.C. § 1930, as determined by the Court at the hearing on confirmation of the Plan, have been paid or the Plan provides for the payment of all such fees on the Effective Date.

This case does not involve the payment of retiree benefits as referred to in 11 U.S.C. § 1129(a)(13).

Accordingly, it is hereby

ORDERED that within 10 days of the date of entry of this order, Club shall amend the Plan to delete section 7.01. It is further

ORDERED that on or before the Effective Date, CCRI may file a certificate of its consent to inclusion in the Plan of Classes 3, 4 and 5. If CCRI fails to file said certificate of consent within the time allotted, Club's Plan shall be deemed amended so as to delete Classes 3, 4 and 5 from the Plan. It is further

ORDERED that CCRI shall file a report setting forth the extent to which amounts escrowed postpetition for property taxes were not actually expended for taxes or tax services.

ORDERED that, subject to the above conditions, Club's Plan is confirmed.