OPINION OF THE COURT
MANSMANN, Circuit Judge.
This matter comes before us on appeal from an order of the district court, which affirmed a bankruptcy judge’s order confirming the debtor’s modified plan for the adjustment of its debts under Chapter 9 of the Bankruptcy Code. We possess jurisdiction pursuant to 28 U.S.C. § 158(d) (Supp. II 1984). Because the debtor proposed the plan lawfully and in good faith, and since the plan permissibly classified the claims of the debtor’s various unsecured creditors, we will affirm the judgment of the district court.
I.
The Jersey City Medical Center (“JCMC” or “the debtor”) is a public municipal hospital which, since 1936, has provided health care for the Hudson County, New Jersey *1057 community, including a substantial number of indigent patients. The plaintiff, Finch Fuel Oil Co. (“Finch”), is a general unsecured creditor to which (according to Finch) JCMC became indebted in the amount of $408,339.40.
In January of 1982, after the State Commissioner of Health found JCMC “financially distressed,” then-Govemor Byrne appointed a reconstituted Board of Managers to replace JCMC’s Board. On December 29, 1982, JCMC filed a petition under Chapter 11 of the Bankruptcy Code, which the bankruptcy judge dismissed on the ground that JCMC was a municipal corporation and was, therefore, ineligible for Chapter 11 reorganization.
On February 10, 1983, JCMC filed a petition for the adjustment of the debts of a municipality under Chapter 9 of the Bankruptcy Code. 11 U.S.C. §§ 901-946. The Official Unsecured Creditors’ Committee objected to the petition because the City of Jersey City allegedly remained liable for the debtor’s debts. The bankruptcy judge denied the committee’s motion to dismiss the petition, and the district court affirmed that judgment.
Following extended negotiations, JCMC on March 29, 1985 filed a plan for the adjustment of its debts along with a disclosure statement. In May of 1985, Finch and the Unsecured Creditors’ Committee filed objections to the disclosure statement, insisting that the debtor possessed funds sufficient to satisfy 100% of all creditors’ claims by virtue of the reimbursement of JCMC’s pre-petition costs from the State Department of Health, and contending that the City of Jersey City was responsible for JCMC’s debts. The bankruptcy judge, however, approved the disclosure statement as amended.
It is instructive to note that, prior to the confirmation of JCMC's Chapter 9 petition, Finch filed suit in state court against the City of Jersey City seeking a declaration that the city was liable for JCMC’s outstanding debts. Yet the trial court entered summary judgment in favor of the city and against Finch. The appellate division affirmed that judgment and the New Jersey Supreme Court denied Finch’s petition for certification.
On June 4, 1985, the debtor submitted a modified plan. That plan provides that priority claims (designated “Class One” under the plan) will be paid on the plan’s effective date. Claims of governmental units will be satisfied within six years from the date of their assessment, with interest at the prevailing rate established by Internal Revenue Service regulations. The court will disburse costs, expenses, and fees by order.
Furthermore, the plan divides the debt- or’s unsecured creditors into four additional classes. “Class Two” creditors — physicians with claims arising out of agreements with the debtor for indemnity against medical malpractice awards — will receive 100% of their claims as finally allowed. “Class Three” creditors — holders of pre-petition medical malpractice claims against JCMC— will get 30% of their claims. Both “Class Two” and “Class Three” payments will come directly from the Jersey City Insurance Fund Commission which, on July 30, 1985, entered into a contract with the debt- or to that effect.
“Class Four” creditors — employee benefit plan non-priority claims — and “Class Five” claimants — general creditors — will obtain 30% of their claims on the effective date of the plan. Disputed claims from these classes will be paid upon the entry of non-appealable orders of the court. Classes Four and Five also will receive pro rata shares from a “surplus fund” [1] and from a pool consisting of 50% of the debtors’ excess 1984 gross revenues.[2]
*1058 Notably, the modified plan preserved the creditors’ rights to recover the rest of their debts from third parties, including the City of Jersey City. The ballot for approval of the plan provided:
The acceptance and/or rejection by the undersigned creditor of the Debtor’s Modified Plan of Reorganization does not constitute a waiver or release of any rights to seek recovery of the creditor’s debt in excess of the dividend under the Modified Plan of Reorganization against third parties or other entities liable by contract or as a matter of law for said obligation.
On July 25, 1985, Finch — the only dissenting member of the general unsecured creditors’ committee — filed objections to the modified plan.
The bankruptcy judge held a lengthy hearing on August 6, 1985. Following the hearing, the attorney for the debtor reported to the judge which classes of claimants had accepted the plan and which had rejected it, according to 11 U.S.C. § 1126.[3] The ballots indicated that Classes Three and Four rejected, and that “Class Five” accepted, the plan.[4] Members of “Class Two” did not vote, apparently since the plan left their claims unimpaired. See 11 U.S.C. § 1126(f). The bankruptcy judge found that the plan comported with the bankruptcy code and with the best interests of the creditors. The district court entered an order affirming the bankruptcy judge’s order confirming the debtor’s plan, and this appeal followed.
II.
A.
Finch presses two issues on appeal. First, it argues that the bankruptcy judge erred in confirming the debtor’s modified plan for the adjustment of its debts since the plan violates the requirement in 11 U.S.C. § 1129(a)(3)[5] that “[t]he plan [must have] been proposed in good faith and not by any means forbidden by law.” Finch cites three instances of JCMC’s alleged bad faith. Finch complains: (a) that the debtor has failed to pursue a claim against the city supposedly arising when the debtor surrendered its right to occupy certain city properties without paying rent; (b) that JCMC by virtue of the state’s rate-setting procedures, had recouped its pre-petition costs— including all debts owing to the general unsecured creditors — in full; and (c) that the debtor misappropriated funds allocated *1059 by law for pre-petition debts in order to improve its facilities.[6]
Second, Finch contends in its points of error that the bankruptcy judge erroneously confirmed the debtor’s plan, since the disparate treatment of “Class Two” and the other general unsecured creditors allegedly contravenes the provision in § 1129(b) that the plan must not discriminate unfairly with respect to each class of impaired, dissenting claimants.
B.
Oh review, the bankruptcy judge’s factual findings should stand unless clearly erroneous. In re Morrissey, 717 F.2d 100, 104 (3d Cir.1983); Bankr.R. 8013, 11 U.S.C. (Supp. II 1984). We independently determine questions of law. See Universal Minerals v. C.A. Hughes & Co., 669 F.2d 98, 101-02 (3d Cir.1981).
III.
The bankruptcy judge found that the debtor’s plan for the adjustment of its debts satisfied the statutory requirement that “[t]he plan [be] proposed in good faith and not by any means forbidden by law.” 11 U.S.C. § 1129(a)(3). The bankruptcy judge’s findings of fact in support of this conclusion are not clearly erroneous.
A.
We find devoid of merit Finch’s complaint that the debtor failed to obtain remuneration, from the City of Jersey City allegedly owing from the debtor’s surrender of city premises which it occupied rent-free. Although the record indicates that the city plans to convert the former JCMC buildings into a residential condominium complex, Finch offers neither a factual basis nor a legal theory to support its argument that the debtor deserves compensation as a former gratis tenant.
B.
Similarly, there is no evidence that JCMC, by virtue of the state’s rate-setting procedures, had recouped its pre-petition costs in full. We cannot label clearly erroneous the bankruptcy judge’s factual finding that JCMC’s modified plan distributes all funds available as a result of JCMC’s 1982 rate adjustment. The record directly belies Finch’s assertion that “thirteen million dollars has been awarded [JCMC] to cover its 1982 costs.”
Concededly, JCMC’s disclosure statement reported that funds available to creditors pursuant to the plan represented a portion of a $13,000,000 rate adjustment authorized by the State Department of Health. As JCMC Executive Director Harvey Holzberg and Chief Financial Officer Ronald DiVito testified, however, JCMC historically collected only about 65% to 75% of its billings, due to its substantial number of indigent patients. Thus, JCMC’s accounts receivable always exceeded actual receipts by 25% to 35%.
The following exchange between counsel for Finch and the bankruptcy judge emphasizes that the debtor had collected far less than $13,000,000:
*1060 MR. GELMAN: And, I think I am trying to show, in my own humble way, that in point of fact the Medical Center which claims its bankruptcy was precipitated by the failure of the State to fund its operations fully in 1982, has collected some thirteen million dollars on account of the — wait a minute, Judge. On account of the 1982 deficiency.
# * * * * *
THE COURT: If you are going to tell me that’s the testimony of either of the two witnesses before me, I’m going to tell you if that is what you are relying on, you haven’t even come close, because maybe I am ignorant both of accounting and of Chapter 9, but I have heard this witness.
I think I have a pretty good idea of the way the State operates, and to make a statement of collecting thirteen million dollars as having come from the cross-examination of these two witnesses is totally, Mr. Gelman, off base.
It bears no relationship to what they have said. This witness has very carefully tried to differentiate his testimony in response to your questions, and I think very frankly he has done an excellent job of explaining the State system, which I happen, by reasons of some other experience of my own, have some vague understanding of.
And, there is just simply no statement before me that says that they have collected thirteen million dollars of these back charges.
Furthermore, the bankruptcy judge found “deceptive” the subsequent testimony of Finch's witness, Ronald Hibbs (a rate setting analyst with the State Department of Health), who attempted to rebut the testimony of both Holzberg and DiVito.
The record nowhere evinces that the debtor had collected revenues by means of its 1982 rate adjustment sufficient to increase payments to Finch and to the other general unsecured creditors under the modified plan.
C.
Moreover, we agree with the bankruptcy judge that JCMC acted properly in expending funds to improve its facilities and in depreciating its property for rate determination purposes. Indeed, it appears from the testimony of Finch’s own witness, Hibbs, that state regulations provide that amounts taken for depreciation expenditures should be used for capital improvements.
In sum, we hold that the bankruptcy judge correctly found that the debtor proposed its plan lawfully and in good faith and, thereby, satisfied 11 U.S.C. § 1129(a)(3).
IV.
We turn next to Finch’s argument that the debtor’s plan discriminates unfairly among the general unsecured creditors and that, therefore, confirmation of the plan was error.
A.
At the outset, nothing in the Bankruptcy Code precludes the debtor from variously classifying the unsecured claims here.
Title 11 U.S.C. § 1122 governs the classification of claims or interests in Chapter 9 plans:
(a) Except as provided in subsection (b) of this section, a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class.
(b) A plan may designate a separate class of claims consisting only of every unsecured claim that is less than or reduced to an amount that the court approves as reasonable and necessary for administrative convenience.
The express language of this statute explicitly forbids a plan from placing dissimilar claims in the same class; it does not, though, address the presence of similar claims in different classes. Although the legislative history behind § 1122 is inconclusive regarding the significance (if any) of this omission, it remains clear that Con *1061 gress intended to afford bankruptcy judges broad discretion to decide the propriety of plans in light of the facts of each case. Cf. In re U.S. Truck Co., Inc., 800 F.2d 581, 584-86 (6th Cir.1986) (discussing the legislative history of § 1122).
Accordingly, we agree with the general view which permits the grouping of similar claims in different classes. See In re U.S. Truck Co., Inc., 800 F.2d at 587; Matter of LeBlanc, 622 F.2d 872, 879, reh’g denied, 627 F.2d 239 (5th Cir.1980); Barnes v. Whelan, 689 F.2d 193, 200-01 (D.C.Cir.1982). See also In re AOV Industries, Inc., 792 F.2d 1140, 1150 (D.C.Cir.1986) (requiring an objecting creditor to show not only that similar claimants appear in different classes, but also that those in its class have disparate claims); 5 Collier on Bankruptcy ¶ 1122.03[l][b] at 1122-7 (15th Ed.1986) (noting that § 1122 “does not require that all claims that are substantially similar be placed in the same class”).
In addition, however, the authorities recognize that the classification of the claims or interests must be reasonable. As the Court of Appeals for the Sixth Circuit has observed:
[Tjhere must be some limit on a debtor’s power to classify creditors in such a manner [to assure that at least one class of impaired creditors will vote for the plan and make it eligible for cram down consideration by the court]. The potential for abuse would be significant otherwise. Unless there is some requirement of keeping similar claims together, nothing would stand in the way of a debtor seeking out a few impaired creditors (or even one such creditor) who will vote for the plan and placing them in their own class. [Footnote omitted.]
In re U.S. Truck Co., Inc., 800 F.2d at 586. The court in Matter of LeBlanc likewise found that a plan should not “arbitrarily” designate classes. 622 F.2d at 879. JCMC’s plan passes muster under these standards.
We immediately note the reasonableness of distinguishing the claims of physicians, medical malpractice victims, employee benefit plan participants, and trade creditors. We additionally recall that JCMC’s unsecured trade creditors overwhelmingly favored the plan. This fact commends the plan’s classification scheme, at least insofar as it affects Finch. See id., citing In re Palisades-on-the-Desplaines, 89 F.2d 214 (7th Cir.1937). Further, we find nothing to show arbitrariness toward Finch as a member of “Class Five”; indeed, the general unsecured creditors’ committee points out in its brief that both “Class Five” and “Class Four” ultimately will receive 30% of their claims on the effective date of the plan.[7]
Moreover, the separate classification of trade creditors like Finch does not alone insure judicial approval of the debtor’s plan. It still must “provide the same treatment for each claim or interest of a particular class....” 11 U.S.C. § 1123(a)(4). Yet, as the Court of Appeals for the Ninth Circuit has noted, “[Section 1123(a)(4) ] only requires equality of treatment of ‘claims’ or ‘interests’ placed in the same class.” In re Acequia, Inc., 787 F.2d 1352, 1363 (9th Cir.1986). See 5 Collier on Bankruptcy ¶ 1123.01[4] at 1123-8-1123-9. JCMC’s plan satisfies that requirement.
B.
Finally, Finch insists that JCMC’s plan fails to satisfy the “cram down” provisions of 11 U.S.C. § 1129(b)(1). That section comes into play only “if all of the applicable requirements of subsection (a) of this section other than paragraph (8) are met with respect to a plan....” 11 U.S.C. § 1129(b)(1) (emphasis added). Section 1129(a)(8) provides:
(a) The court shall confirm a plan only if all of the following requirements are met:
(8) With respect to each class of claims or interests—
*1062 (A) such class has accepted the plan; or
(B) such class is not impaired under the plan.
Here, since “Class Five” (to which Finch belongs) has accepted JCMC’s plan, see supra note 4, § 1129(b)(1) affords Finch no protection. We, therefore, need not address whether the plan satisfies the “cram down” provision.
V.
The bankruptcy judge properly concluded that the debtor proposed its plan lawfully and in good faith. The plan, as well, permissibly classified the claims of JCMC’s various unsecured creditors. The judgment of the district court affirming the bankruptcy judge’s order confirming the debtor’s modified plan for the adjustment of its debts will, accordingly, be affirmed.

. The modified plan defines “surplus fund” as "the difference between $4,619,200[,] the Debt- or’s estimate of priority claims, exclusive of administration fees and expenses, and the total amount of priority claims allowed herein exclusive of administration fees and expenses, together with 30% of the difference between $7,820,-125, the Debtor’s estimate of Class Four and Five claims and the total amount of Class Four and Five claims allowed herein."

. The original plan defined “excess 1984 gross revenues” as "the amount, if any, by which unrestricted cash received by and credited to the Debtor in calendar year 1984 exceeded the *1058 sum of $64,336,000.00." The modified plan fixed that amount at $120,000.

. 11 U.S.C. § 1126(c) provides:
A class of claims has accepted a plan if such plan has been accepted by creditors ... that hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class held by creditors ... that have accepted or rejected such plan.

. "Class Three" cast one vote for and twenty-five against the plan; the ballots stated claims in the amount of $32,400,000. "Class Five" voted 251 to 10 in favor of the plan. The ten dissenting claimants held claims totaling just $462,874 out of an aggregate $4,970,000.
The “Class Four" ballots showed that 274 of 344 claimants opted to accept the plan, but that their claims represented only $445,934 or approximately 54 percent of the $820,888 owing to "Class Four." However, one dissenting class member asserted a claim exceeding $100,000 for vacation and holiday pay which had accrued 180 days prior to the debtor’s bankruptcy petition. This ballot seemed patently erroneous. The bankruptcy judge, nonetheless, assumed that "Class Four” had rejected the plan. Although the debtor reserved the right to defer consideration of the plan and to poll "Class Four" again, no party on appeal has contested the bankruptcy judge’s actions on this issue. Thus, we assume without deciding that “Class Four" rejected the plan.

. 11 U.S.C. § 901(a) makes various sections of the Bankruptcy Code at large applicable to the adjustment of the debts of a municipality pursuant to Chapter 9. Section 901(a) provides:
Sections 301, 344, 347(b), 349, 350(b), 361, 362, 364(c), 364(d), 364(e), 364(f), 365, 366, 501, 502, 503, 504, 506, 507(a)(1), 509, 510, 524(a)(1), 524(a)(2), 544, 545, 546, 547, 548, 549(a), 549(c), 549(d), 550, 551, 552, 553, 557, 1102, 1103, 1109, 1111(b), 1122, 1123(a)(1), 1123(a)(2), 1123(a)(3), 1123(a)(4), 1123(a)(5), 1123(b), 1124, 1125, 1126(a), 1126(b), 1126(c), 1126(e), 1126(f), 1126(g), 1127(d), 1128, 1129(a)(2), 1129(a)(3), 1129(a)(8), U29(a)(10), 1129(b)(1), 1129(b)(2)(A), 1129(b)(2)(B), 1142(b), 1143, 1144, and 1145 of this title apply in a case under this chapter.

. In its brief, Finch also complained that the plan does not take into account the averred liability of the City of Jersey City for JCMC’s debts. At oral argument, however, Finch conceded that issue.
When Finch filed its notice of appeal to our court, the New Jersey Supreme Court had yet to act upon Finch’s petition for certification in its action to determine the liability of the City of Jersey City for JCMC’s debts. (The state Supreme Court subsequently denied the petition.) Thus, Finch apparently believed that the decision of the appellate division lacked finality, at least so long as the petition for certification remained pending.
We emphasize, however, that 28 U.S.C. § 1738 requires federal courts to afford state court judgments the same preclusive effect which would exist in the rendering state. Allen v. McCurry, 449 U.S. 90, 96, 101 S.Ct. 411, 415, 66 L.Ed.2d 308 (1980). See Migra v. Warren City Dist. Bd. of Educ., 465 U.S. 75, 80-81, 104 S.Ct. 892, 895-96, 79 L.Ed.2d 56 (1984). New Jersey law recognizes a judgment as "final” for res judicata purposes, even though it is pending on appeal. See, e.g., Gregory Marketing Corp. v. Wakefern Food Corp., 207 N.J.Super. 607, 504 A.2d 828, 836 (1985).
Since the New Jersey Supreme Court has now denied the petition for certification, there is no question that the judgment is now final for res judicata purposes as Finch concedes.

. Although "Class Three” similarly will obtain 30% of its claims, additional sums apparently will pass through "Class Two" to “Class Three.” We, therefore, refrain from comparing "Class Three" to Classes Four and Five.