**In re LABRUM & DOAK, LLP, Debtor.**

**Bankruptcy No. 98–10215DAS.**

United States Bankruptcy Court,
E.D. Pennsylvania,
Philadelphia Division.

Nov. 13, 1998.

Neal Colton, Philadelphia, PA, for Debtor.

Aris Karalis, Ciardi, Maschmeyer & Karalis, P.C., Philadelphia, PA, for Unsecured Creditors Committee.

Paul J. Winterhalter, Philadelphia, PA, for Petitioners and Former Partners' Committee.

Lawrence J. Tabas, Obermayer, Rebmann Maxwell & Heppel, LLP, Philadelphia, PA, Chairman of Creditors' Committee.

Nicholas J. LePore, III, Schnader Harrison Segal Lewis, LLP, Philadelphia, PA, for Daniel J. Ryan.

Robert Szwajkos, Lavin, Coleman, O'Neil, Ricci, Finarelly & Gray, Philadelphia, PA, for Barbara L. Hollenbach.

Jay G. Ochroch, Fox, Rothschild, O'Brien & Frankel, Philadelphia, PA, for Kean McDonald.

Robert Lapowsky, Wayne, PA, for David J. Parsells.

Mark J. Packel, Duane, Morris & Heckscher, LLP, Philadelphia, PA, for Continental Casualty Co.

Emily Abbott, Horn, Goldberg, Gorny, Plackter, Weiss & Perskie, Atlantic City, NJ, for Athena Assurance Co.

Frederic Baker, Philadelphia, PA, Ass't. U.S. Trustee.

## OPINION

DAVID A. SCHOLL, Chief Judge.

### A. INTRODUCTION

Presently before us for determination in the contentious Chapter 11 case of LABRUM & DOAK, LLP ("the Debtor"), a dissolved law firm, are certain Objections to the Liquidating Plan of Reorganization ("the Plan") proposed by the Official Committee of Unsecured Creditors ("the UC Committee"). The principal objections are these of former partners contending that the Plan improperly classifies their claims subordinate to the claims of general unsecured creditors and that the Plan improperly gives the UC Committee itself broad post-confirmation powers, which include pursuing deficiency claims against the partners.

We conclude that the classification scheme proposed in the Plan is in conformity with applicable law and the Debtor's partnership agreement. We also find that the powers delegated to the UC Committee are authorized by 11 U.S.C. § 1123(b)(3)(B) and are generally appropriate.

However, among the many objections are a few which possibly have merit and present suggestions for amending the plant to the UC Committee which it may wish to take. We will therefore give the UC Committee an opportunity to amend the Plan on or before November 23, 1998, and will reschedule the confirmation hearing for December 2, 1998.

## B. PROCEDURAL AND FACTUAL HISTORY

On January 6, 1998, six former partners of the Debtor filed an involuntary Chapter 7 case against it. Pursuant to the Debtor's motion, filed on January 7, 1998, this case was converted to a Chapter 11 case on January 22, 1998.

Although the Debtor filed its own initial Chapter 11 plan and accompanying disclosure statement as early as February 17, 1998, hearings on the disclosure statement were put off while some of the many adversary proceedings arising in this case were litigated, through July 22, 1998. At that time the Debtor agreed to produce, possibly jointly with the UC Committee, an amended plan by August 7, 1998. Although this deadline was later put off until August 28, 1998, the Debtor did file an amended plan and accompanying disclosure statement on the latter date. However, the UC Committee, which had not joined the Debtor's plan after all, proceeded to file a plan and disclosure statement of its own on September 1, 1998. On September 9, 1998, both disclosure statements were approved as permissible modifications of the initial disclosure statement submitted in February by the Debtor. Confirmation hearings on both plans were scheduled on October 21, 1998.

At the commencement of the hearings on October 21, 1998, the Debtor withdrew its plan, which had garnered less acceptances support than the instant Plan, and put its support behind this Plan. The UC Commit-

tee's Chairman, Lawrence J. Tabas, Esquire, and its accountant, George L. Miller, testified in support of the Plan. Daniel J. Ryan, Esquire, who retired as a partner of the Debtor effective December 31, 1996, several months prior to it dissolution, was the only witness for the objectors. After the hearing, plan proponents were accorded until October 30, 1998, to file a supporting brief, and plan objectors were accorded with November 6, 1998, to submit briefs opposing confirmation.

Before focusing on the facts relevant to the contested matter at hand, comment should be made about the status of other outstanding litigation arising out of this case. Appearing in the Bankruptcy Reporter are a decision of July 30, 1998, allocating tax recapture liability arising from the Debtor's former Philadelphia office among its former as well as present partners, reported at 222 B.R. 749; and an Opinion of August 14, 1998, reported at 225 B.R. 111, supplemented by a further decision of October 19, 1998, reported at 226 B.R. 161, which awarded the Debtor a portion of fees from contingency-fee cases taken over by former firm attorneys who, unlike most, chose not to settle this issue with the Debtor. Briefing has also been completed on November 4, 1998, and November 6, 1998, respectively, regarding additional proceedings (1) seeking to recover distributions made to partners in the year prior to bankruptcy, pursuant to, principally, 11 U.S.C. § 548(b); and (2) an attempt to recover the value of hourly-fee cases taken over by former attorneys of the Debtor at their new firms. Seven other decisions, most deciding pre-trial motions in the various proceedings in this case, appear on Westlaw.

None of these prior decisions related directly to plan confirmation issues. This is atypical because generally developments in a Chapter 11 case revolve around confirmation of a plan. The different course of this case is explained by the fact that any Chapter 11 plan must be a liquidating one, as the Debtor dissolved on July 31, 1997. The only undertaking of a plan, in this context, is the development of the order for distribution of whatever assets the Debtor is able to recover, mostly through litigation, and the means for conducting any additional necessary litigation

to collect funds. Since the Debtor was a large law firm, the interested parties are themselves lawyers, and many of these parties have chosen to engage in a good deal of litigation in this case themselves.

The Plan provides for six classes. Class 1 is Priority Claims, which must be paid in full. Class 2–A consists of landlords' claims and Class 2–B of all other general unsecured claims. Members of these two classes are treated equally, to be paid in full with interest or, in the absence of available funds *pro rata* prior to all other classes. Although these two Class 2 sub-classes may have divided to satisfy the 11 U.S.C. § 1129(a)(10) requirement of obtaining at least one accepting impaired class, both of these classes voted to accept the Plan by comfortable margins, *e.g.*, Class 2–A voted 2–0, and Class 2–B voted 16–3, with 84% of the amount of claims voting having voted to accept the Plan.

Class 3 includes unsecured claims of former partners for withdrawal, termination, and retirement benefits. Its members are to be paid in full with interest or *pro rata,* as is applicable, only after Classes 2–A and 2–B are paid in full with interest. Class 4 consists of other allowed claims of former partners, defined as parties who left the Debtor one year or more prior to the dissolution vote of June 5, 1997. Its members are paid in full with interest or *pro rata,* as is applicable, only after Classes 2–A, 2–B, and 3 are paid in full with interest. Class 5, including claims of present partners, defined as partners remaining with the Debtor 60 days prior to the dissolution vote, are to be paid only if all other classes are paid in full with interest.

All eighteen (18) attorneys included in Classes 3, 4, and 5 except Perry S. Bechtle, a retiree member of Class 3, voted to reject the Plan. Three attorneys, including Kean McDonald, the only attorney believed to have left the firm in the "gap" period between one year and 60 days prior to dissolution, voted as a member of both Classes 3 and 4. The voting report also notes that nearly all of the unsecured creditors voting; and Bechtle, Ryan and another attorney voting in Class 3, Ronald Uzdavinis, Esquire, expressed a preference for the Plan over that submitted by the Debtor, while McDonald, liquidating partner Peter Neeson, Esquire, and the four members of Class 5 casting ballots, including Barbara Hollenbach, Esquire, David Parsells, Esquire, John D. Lucey, Jr., Esquire, and John E. Salmon, Esquire, expressed a preference for the Debtor's plan.

Six entities, including two non-voting insurance companies who have reportedly resolved their differences with the Plan, Continental Casualty Co. and Athena Assurance Co., filed objections to confirmation of the Plan. The remaining four parties who filed objections were Ryan, Hollenbach, Parsells, and the Official Committee of Former Partners ("the FP Committee"). Parsells filed no opposing brief. McDonald did not file any objections to confirmation, but he appeared at the confirmation hearing and submitted a timely brief in opposition to confirmation.

Many of the major objections are overlapping and a few are inconsistent with each other. The two most pervasive categories of objections relate to (1) the classification of the former and present partners' claims separate from general unsecured creditors, and (2) the broad scope of post-confirmation authority given to the UC Committee. The Plan's classification scheme is described at page 375 *supra.* The post-confirmation powers accorded to the UC Committee are mostly provided in Article XI of the Plan, which reads as follows:

### Causes of Action

11.1 *Retention, Enforcement and Waiver of Claims.* Pursuant to Section 1123(b)(3) of the Bankruptcy Code, the Debtor shall retain and, through the Creditors' Committee, which shall have all requisite standing under the law, may enforce any and all claims of the Debtor and/or the Debtor-in-Possession, including Bankruptcy Causes of Action. The proceeds of any recovery shall be paid according to the terms of the Plan.

11.2 *Powers.* The Creditors' Committee shall have the right to settle, compromise, sell, assign, terminate, release, discontinue or abandon any Cause of Action from time to time in its sole discretion.

Prominent among the causes of action retained, over which this court is to retain exclusive jurisdiction, are deficiency actions against the partners, pursuant to ¶ 10.2 of the Plan.

### C. DISCUSSION.

#### 1. The Plan's Classification of Claims Is Permissible.

■ The FP Committee, Ryan, and Hollenbach all vigorously contest the Plan's classification provisions. In this regard, McDonald appears to dispute only the fact that, having resigned from the Debtor on February 14, 1997, he falls into neither the defined class of "former" (left less than one year prior to dissolution) nor "present" (left more than 60 days prior to the dissolution) partners. The creation of this "gap" appears to be an oversight which the UC Committee should correct. McDonald's designation as a Class 3 and a Class 4 "former" partner in the Vote Report may settle this apparent quandary.

Hollenbach's objection on this score is also unique. She disputes the preference which former partners receive over present partners. Meanwhile, the FP Committee contends that former partners' claims should be treated the same as "other" unsecured claims. Ryan similarly argues that he should be treated "no worse" than "other" unsecured creditors.

The Code provision relevant to classification of claims in the instant Chapter 11 plan is 11 U.S.C. § 1122(a), which provides as follows:

§ 1122. Classification of claims or interests

(a) Except as provided in subsection (b) of this section, a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class.

The Third Circuit Court of Appeals has addressed this Code section at length in two decisions, *John Hancock Mutual Life Ins. Co. v. Route 37 Business Park Associates,* 987 F.2d 154, 158–61 (3d Cir.1993); and *In re Jersey City Medical Center,* 817 F.2d 1055, 1060–61 (3d Cir.1987). *Jersey City* af-

firmed confirmation of a Chapter 11 plan which created four separate classes of unsecured creditors, including, respectively, claims of physicians, medical malpractice claimants, employee benefit plan claimants, and general unsecured creditors. 817 F.2d at 1057. The plan contemplated 100% payment to the physician class members, but only 30% payments to the others. *Id.* In supporting this classification scheme, the court stated, *id.* at 1060–61:

The express language of this statute explicitly forbids a plan from placing dissimilar claims in the same class; it does not, though, address the presence of similar claims in different classes. Although the legislative history behind § 1122 is inconclusive regarding the significance (if any) of this omission, it remains clear that Congress intended to afford bankruptcy judges broad discretion to decide the propriety of plans in light of the facts of each case.

Accordingly, we agree with the general view which permits the grouping of similar claims in different classes. . . .

In addition, however, the authorities recognize that the classification of the claims or interests must be reasonable. As the Court of Appeals for the Sixth Circuit has observed:

"[T]here must be some limit on a debtor's power to classify creditors in such a manner [to assure that at least one class of impaired creditors will vote for the plan and make it eligible for cram down consideration by the court]. The potential for abuse would be significant otherwise. Unless there is some requirement of keeping similar claims together, nothing would stand in the way of a debtor seeking out a few impaired creditors (or even one such creditor) who will vote for the plan and placing them in their own class. [Footnote omitted]."

*In re U.S. Truck Co., Inc.,* 800 F.2d [581,] at 586 [ (6th Cir.1986) ] . . . .

In *Hancock,* the court refused to allow a single-asset realty partnership debtor to separately classify the unsecured portion of an undersecured mortgagee's claim, stating as follows at 987 F.2d at 159:

While our opinion in *Matter of Jersey City Medical Ctr.* did not spell out the factors that should be considered in determining whether a classification scheme is reasonable, it seems clear to us that this determination must be informed by the two purposes that classification serves under the Code: voting to determine whether a plan can be confirmed (see 11 U.S.C. § 1129(a)(8), (10) (1988)) and treatment of claims under the plan (see 11 U.S.C. § 1123(a)(4) (1988)). Thus, where, as in this case, the sole purpose and effect of creating multiple classes is to mold the outcome of the voting, it follows that the classification scheme must provide a reasonable method for counting votes. In a "cram down" case, this means that each class must represent a voting interest that is sufficiently distinct and weighty to merit a separate voice in the decision whether the proposed reorganization should proceed. Otherwise, the classification scheme would simply constitute a method for circumventing the requirement set out in 11 U.S.C. § 1129(a)(10) (1988).

It is clear that the instant Plan classifications were not necessary to satisfy the § 1129(a)(10) requirement, as was the case with the *Hancock* plan. If it could be argued that Class 2 was spliced into Classes 2–A and 2–B for this purpose, the acceptance of the plan by both Class 2–A and Class 2–B eliminates the need for any such device. The different classification and treatment of the classes of claims at issue—general unsecured claims, former partners' with retirement or with withdrawal claims, former partners' claims for return of capital, and present partners' claims—seems quite logical, more-so than the division of claims at issue in *Jersey City*.

The objectives of the FP Committee and Ryan on this score must, in light of the fact that the classification itself is well justified under *Jersey City* standards, be aimed at the disparity in the treatment of their claims vis-a-vis the general unsecured claims, not the classification *per se*. *See In re 222 Liberty Associates*, 108 B.R. 971, 989–93 (Bankr. E.D.Pa.1990) (disparate treatment of similar claims may be impermissible even when separate classifications are upheld).

The UC Committee concedes that the treatment of the claims in the different classes is disparate. Indeed, it places these different claims in the classes it does for the very purpose of supporting the priority of distribution furthered by the Plan. However, the UC Committee argues that the Plan's payment priorities are consistent with Pennsylvania state partnership law; holdings in bankruptcy decisions in this state and elsewhere regarding the subordination of claim of partners to those of outside creditors; and the terms of the Debtor's Amended and Restated Partnership Agreement for the Law Firm of Labrum and Doak ("the PA").

The pertinent Pennsylvania law referenced by the UC Committee is 15 Pa.C.S. §§ 8362(2), (9), which provide as follows:

In settling accounts between the partners after dissolution, the following rules shall be observed, subject to any agreement to the contrary:

. . .

(2) The liabilities of the partnership shall rank, in order of payment, as follows:

(i) Those owing to creditors other than partners.

(ii) Those owing to partners other than for capital and profits.

(iii) Those owing to partners in respect of capital.

(iv) Those owing to partners in respect of profits.

. . .

(9) Where a partner has become bankrupt or his estate is insolvent, the claims against his separate property shall rank in the following order:

(i) Those owing to separate creditors.

(ii) Those owing to partnership creditors.

(iii) Those owing to partners by way of contribution . . .

The pertinent PA provisions, ¶ 17.1, relating to Dissolution, provides as follows:

After payment of all costs of the liquidation, the net assets and the proceeds of the liquidation shall be applied as follows:

(a) payment of the liabilities and debts of the partnership to creditors other than the partners;

(b) payment of unmatured installments yet to be paid on account of prior death, termination, disability, withdrawal or retirement of partners;

(c) payment of debts and liabilities owing to the partners including salaries accrued but unpaid at the time liquidation was voted, but excluding capital and undistributed profits;

(d) repayment of the partners' capital contributions and undistributed profits; and

(e) payment of the balance of the assets and proceeds, to be distributed, at the time or times and in the manner specified by the Liquidating Partners, among those partners who were partners on the date liquidation was voted, in the same proportion as their respective Partnership Points in the firm as of that date.

The caselaw cited for the principle that non-partner creditors are entitled to subordinate the claims of partner creditors to general unsecured creditors is the following: *In re Ben Franklin Hotel Associates,* 1998 WL 94808, at *2 (E.D.Pa. March 4, 1998) (" '[A]n ownership interest in a debtor partnership differs fundamentally from other rights that might be asserted against the partnership[.] "An ownership interest is not a debt of the partnership. Partners own the partnership subject to the profits and losses. Creditors, however hold claims regardless of the performance of the partnership. Thus, an ownership interest in not a claim against the partnership," ' quoting *In re Riverside–Linden Investment Co.,* 925 F.2d 320, 323 (9th Cir. 1991) (per curiam), quoting *In re Riverside–Linden Investment Co.,* 99 B.R. 439 (9th Cir. BAP 1989) ...."); *In re Bower & Gardner,* Case No. 94–B–44743 (Bankr.S.D.N.Y. Oct. 1, 1997) (distributive rights of "prior partner" of debtor law firm subordinated to all "outside, general" creditors solely because of the claimant's former partner status); and *In re Berlin,* 151 B.R. 719, 723–24 (Bankr.W.D.Pa. 1993) (" 'Until the creditors of a partnership are satisfied, each partner has no right to any distribution from the partnership.'

*Johnson v. Investment Leasing, Inc.* (*In re Johnson* ), 51 B.R. 220, 222 (D.Colo.1985)."). *Cf. In re Envirodyne Industries, Inc.,* 79 F.3d 579, 582–83 (" 'The assets of a corporation are the common pledge of its creditors, and shareholders are not entitled to receive any part unless creditors are paid in full,' " quoting *Robinson v. Wangemann,* 75 F.2d 756, 757 (5th Cir.1935)).

Thus, the UC Committee argues that not only are the priorities designated in the Plan appropriate, but they are required by the foregoing general legal principles, pertinent state law, and terms of the PA.

The responses of the FP Committee and Ryan, though made with the UC Committee's supporting brief citing the foregoing authority in hand, are unable to confront those arguments with anything more than empty rhetoric. The FP Committee criticizes the. case quotes above as "snippet and serial citations." However, it is able to produce neither a citation nor a "snippet" to the contrary. As to Pennsylvania law, it cites to different provisions of the Partnership Act, relating to limited partnerships, 15 U.S.C. §§ 8552, 8554, and 8563. However, these statutory provisions address only the rights of partners and creditors, respectively, with no reference to priorities among them. The PA quotation is deemed inconclusive because category (b) claims include only "unmatured" payments on benefit plans and do not reference such "matured" payments, as are at issue. However true it may be that "matured" obligations are not referenced, it seems. illogical, as the FP Committee apparently suggests, to leapfrog the priority of such claims over those of creditors other than partners merely because of their status as "matured" claims.

Ryan argues that state law and the PA cannot override Bankruptcy Code priorities. However, he cites no Code authority indicating that the Plan's provisions are illegal or disfavored, nor authority for the notion that state law and pertinent contractual provisions can be disregarded in this context. Like the FP Committee, he is unable to cite authority which contradicts the UC Committee's statement that the Plan is completely consistent with the applicable law.

■ The most that can be said for these arguments is that they dispute the UC Committee's arguments that the Plan's priorities are *mandated* by state law and the terms of the PA. It seems to us, however, that the terms of a Chapter 11 plan which are accepted by all classes of creditors except these including insiders[1] should be confirmed unless its terms are demonstrated to be *contrary* to the Code or other applicable law. It is not impermissible for the terms of a Chapter 11 plan to clarify an establish rights not otherwise fixed by law or contract. *Cf. Ingleside Associates, supra,* 136 B.R. at 962 (partnership agreement is subject to clarification and even minor modifications in a Chapter 11 plan).

The classifications proposed here certainly make as much sense as the classification scheme in *Jersey City,* which not only classified legally-equivalent unsecured claims differently, but treated the numbers of one of those classes quite disparately from the others. We therefore conclude that the Plan's classification scheme is quite consistent with the standards set forth in *Jersey City.*

### 2. The Plan's Provisions Allowing the UC Committee to Prosecute Claims Post–Confirmation Are Permissible.

■ All of the objectors address the Plan provision referenced at pages 375–376 *supra,* which empower the UC Committee to prosecute claims, particularly deficiency claims against the objecting parties. This is not surprising, because these claims will be prosecuted against the objectors themselves, *i.e.,* against present and possibly former partners of the Debtor. The only authorities cited by the objectors in opposition to these provisions are cases such as *In re Kaveney,* 60 B.R. 34 (9th Cir. BAP 1985); and *In re Monetary Group,* 55 B.R. 297 (Bankr. M.D.Fla.1985), which establish that a Chapter 11 trustee is not automatically vested, by reason of his trusteeship, to exercise the power of a Chapter 7 trustee to pursue defi-

ciency claims against partners pursuant to 11 U.S.C. § 723.

The Plan provisions do not, however, rely on § 723 as a source of this authority. As the UC Committee points out, the right to assert deficiency claims against partners lies in the hands of any assignee or person appointed by a court to do so, pursuant to 15 Pa.C.S. § 8362(5).

The Code Section authorizing the inclusion of provisions empowering the UC Committee to undertake this function in the Plan is 11 U.S.C. § 1123(b)(3)(B), which provides that

(b) Subject to ·subsection (a) of this section, a plan may—

. . .

(3) provide for—

. . .

(B) the retention and enforcement by the debtor, by the trustee, *or by a representative of the estate appointed for such purpose,* of any such claim or interest; . . . (emphasis added)

As is stated at 7 COLLIER ON BANK-RUPTCY, ¶ 1103.05[7], at 1103–37 (15th ed. rev.1998),

[i]t is quite common for chapter 11 plans to provide that the creditors'· committee shall have the right after confirmation of a plan to prosecute various actions on behalf of the debtor in possession. There are many reasons why a plan might so provide. The creditors are likely to be the persons who will benefit from the recovery. . . .

*See also In re Sweetwater, Inc.,* 884 F.2d 1323, 1326–30 (10th Cir.1989); *In re Maxwell Newspapers, Inc.,* 189 B.R. 282, 287 (Bankr. S.D.N.Y.1995) ("the primary consideration in determining whether the creditor is a 'representative of the estate' is the benefit bestowed upon the estate as a result of the transfer, in particular the benefit to unsecured creditors"); *In re Mayer Pollock Steel Corp.,* 174 B.R. 414, 418 (Bankr.E.D.Pa.1994) (plan provision limiting claims objections to

---

1. The present partners are clearly "insiders" by definition. 11 U.S.C. § 101(31)(C)(i). Former partners also appear to fit within the residual definition of this term. *See In re Main, Inc.,* 213 B.R. 67, 81–82 (Bankr.E.D.Pa.1997), *aff'd in part*

& *rev'd & remanded in part on other grounds sub nom. In re Blatstein,* 226 B.R. 140 (E.D.Pa.1998), *reinstated on remand,* 1998 WL 778017 (Bankr. E.D.Pa. Nov. 4, 1998); and *In re Ingleside Associates,* 136 B.R. 955, 961 (Bankr.E.D.Pa.1992).

those identified by the creditors' committee and allowing settlement of such objections only upon the Committee's consent did not bar confirmation); and *In re Churchfield Management & Investment Corp.,* 122 B.R. 76, 81–83 (Bankr.N.D.Ill.1990).

The most strident objections to this Plan provision came from McDonald, who criticizes the UC Committee as an unfairly-constituted group which is dominated by landlords and is committed to spawning further litigation in an already over-litigated case. The FP Committee, while complimenting UC Committee Chairman Tabas as a bankruptcy attorney "beyond reproach," believes that he will overlook the potential 11 U.S.C. § 502(b)(6) limitation on the claim of his client-landlord.

As the only party sufficiently interested in prosecution of these issues to file the Plan delegating the responsibility to itself to do so, the UC Committee appears a particularly well-motivated and capable party to undertake the anticipated deficiency-claim litigation. As Collier, *Maxwell,* and *Churchfield* point out, the primary beneficiaries of § 1123(b)(3)(B) appointments should be unsecured creditors. The UC Committee, as the official representative of such creditors, thus appears the archetypical appropriate party to maintain such actions.

The UC Committee was appointed by the United States Trustee early in the case, see 11 U.S.C. § 1102(a)(1); had not had its constituency criticized to date; and has vigorously and competently undertaken many difficult tasks in this case, including prosecuting the difficult hourly-fee compensation proceeding. McDonald's criticism regarding the UC Committee's constituency at this juncture therefore appears both untimely and unjustified. Totally disinterested parties can hardly be expected to undertake such difficult tasks. Almost all of the unsecured creditors, big and small, have voted their support for the Plan. The criticism of McDonald and the other objectors on this point appears motivated by a more serious conflicted situation than that which they charge the UC Committee: they wish to avoid a vigorous and difficult opponent on an issue where they perceive that they may have liability. Inso-

far as the spawning of litigation is concerned, much could be avoided if responsible parties acknowledge liability on some of the more obvious claims (and if interested parties did not assert empty objections to Chapter 11 plans).

To Ryan's contention that the UC Committee will go easy on pursuing challenges to its constituent landlord's claims, we remind Ryan of our statements in *In re LaBrum & Doak, LLP,* 1998 WL 246530, at *2 (Bankr. E.D.Pa. May 14, 1998), that

individual creditors, at least in certain circumstances, can be authorized to act for debtors. *See [In re ] Gibson Group,* [66 F.3d 1436, 1439 (6th Cir.1995) ]; *In re Shelby Motel Group, Inc.,* 123 B.R. 98 (N.D.Ala.1990); and *In re V. Savino Oil & Heating Co.,* 91 B.R. 655 (Bankr.E.D.N.Y. 1988). This court has done so on at least two occasions. See *In re Laramie Associates,* 1996 WL 549984, at *1 (Bankr. E.D.Pa. June 20, 1996); and *In re Lease-A–Fleet, Inc.,* 1993 WL 102041, at *2–*3 (Bankr.E.D.Pa. March 19, 1993) . . . .

The Debtor itself may object to the landlord's claims. The FP Committee and individual creditors like Ryan himself could also be authorized to do so if the Debtor and the UC Committee both unreasonably refuse to act in this area.

We are therefore unimpressed by this objection to the general aspect of the Plan delegating to the UC Committee the responsibility of prosecuting post-confirmation litigation on behalf of the Debtor, specifically deficiency claims against the partners who do not themselves file bankruptcy, as at least five have.

3. *A Few of the Many Objections Not Covered by the Foregoing Discussions Appear to Have Merit.*

The foregoing discussions appear to us to address all of the objections articulated by Parsells and McDonald. The objections asserted by the FP Committee, Ryan, and Hollenbach are more elaborate, and contain numerous technical objections, several of which justify at least a brief discussion. Some, as we shall note, have possible merit

and constitute issues which the UC Committee should consider as bases for amending the Plan.

Ryan and Hollenbach each invoke the Plan's alleged failure to satisfy 11 U.S.C. § 1129(a)(7) as a basis for objection to its confirmation, albeit for different reasons. Ryan claims that he would fare better in a Chapter 7 case context because, in such a scenario, he could pursue his own claims against the partners. Hollenbach, meanwhile, argues that a Chapter 7 trustee could utilize § 723 and would be better able to control and limit the litigation emanating from the case than any of the interested parties presently involved in the litigation arising out of this case.

■ Both of these arguments seem to miss the point of the "best interests of creditors" test of § 1129(a)(7), which focuses on whether creditors would receive at least as much under a Chapter 7 case from the Debtor's assets as they do under the Plan. *See, e.g., In re Applied Safety, Inc.*, 200 B.R. 576, 587 (Bankr.E.D.Pa.1996). Ryan appears to believe that the Plan would affect his rights to proceed against the individual partners. We do not think that this would be the case. The individual partners are not debtors who have been protected by the automatic stay in this case to date. *See, e.g., In re University Medical Center*, 82 B.R. 754, 757, 759–60 (Bankr.E.D.Pa.1988). The Plan certainly does not alter this status quo to Ryan's disadvantage. *But see* the discussion of Hollenbach's objections regarding the scope of the stay at page 382 *infra.*

■ Hollenbach's argument that a Chapter 7 trustee would be a qualitatively better liquidating agent than the Debtor or the UC Committee is not the issue. Since the Plan is a liquidating one, and the distribution priorities established are those which we have held are consistent with applicable law and the PA, it appears that a trustee would be likely, and may be obliged to, effect substantially the same liquidation priorities as those proposed in the Plan. It is therefore difficult to see how § 1129(a)(7) is not satisfied by the Plan on this score.

The FP Committee and Hollenbach both argue that the Plan purports to assume the PA as an executory contract, but finds to cure all the defaults to the partners under the PA, as is purportedly required by 11 U.S.C. § 365(b). In its brief, the UC Committee explains that, since the Debtor has dissolved, it is only the Dissolution provisions of Article XVII of the PA, see page 378 *supra*, which it seeks to assume by proceeding in conformity with ¶ 17.1 of the PA. We find this issue a rather difficult and unnecessary one for the UC Committee to approach. While its arguments may be conceptually correct, we see no purpose served by the Debtor's assumption of the PA. We therefore suggest that the UC Committee consider deleting this provision from the Plan.

The FP Committee invokes 11 U.S.C. § 1129(a)(5)(A)(ii), claiming that Tabas' role as Plan Administrator and counsel for the landlords creates a conflict. As noted at page 380 *supra* in our discussion of the UC Committee's role in the Plan's administration, we reject this argument.

■ Ryan contends that the general requirements that a plan must be fair and equitable appearing in 11 U.S.C. §§ 1129(b)(1) and (b)(2) and that a plan must be proposed in good faith, per 11 U.S.C. § 1129(a)(3), are violated in the Plan because he is discriminated against and the landlord creditors, who do not have recourse against the partners, are elevated in status by the Plan. However, as we held in *In re 222 Liberty Associates*, 1990 WL 29763, at *1 (Bankr.E.D.Pa. March 19, 1990), to achieve a "cramdown" of classes of partnership interests, pursuant to § 1129(b)(2)(C)(ii) of § 1129(b), it is only necessary to provide in a plan that no interests junior to the classes of interests rejecting the plan receive anything not received by senior classes. Ryan's claim, arising from his capacity as a former partner, is an "interest." As indicated at pages 377–378 *supra*, he receives only the status to which he is entitled under state law and the PA under the Plan. As we discussed at page 377–379 *supra*, the landlords, as unsecured creditors not having an interest in the Debtor, are entitled to priority over all interest holders, including Ryan.

Ryan also includes a discussion regarding the extreme breadth of a purported ¶ 7.10.2 of the plan. We can locate no such section or provision in the Plan. If Ryan's quotation is correct, the UC Committee should amend the filed version of the Plan to include this provision and language.

 Hollenbach raises a few more issues. First, she claims that interest cannot be paid to unsecured creditors if the Debtor's estate is insolvent, *i.e.*, unable to pay all claims in full. This argument represents apparent confusion with the principle that creditors do not have a right to payment of post-confirmation interest unless a debtor is solvent. *See In re Shaffer Furniture Co.*, 68 B.R. 827, 830 (Bankr.E.D.Pa.1987). However, there is no reason why a plan cannot provide that interest be paid to claims, even if such a claimant could not assert an enforceable right to payment of same.

 Further, Hollenbach objects to provisions of the Plan which she reads as exempting the UC Committee's post confirmation services from court scrutiny and limits the liability of the UC Committee for negligent acts in performing its duties. We note that ¶ 4.1 of the Plan merely states that the UC Committee's fees must be approved by the UC Committee, but does not exclude court oversight. We are not inclined to read the Plan as precluding our oversight of fees. *See In re John G. Berg Associates, Inc.*, 138 B.R. 782, 787 (Bankr.E.D.Pa.1992) (if the bankruptcy court retains jurisdiction of matters arising in a case, it retains control over compensation awarded in prosecuting such matters). We agree that the exculpation of liability clause of the Plan, ¶ 12.7, which purports to eliminate liability of not only the UC Committee, but also the FP Committee and the Debtor's counsel and professionals, from liability for all but "willful misconduct or gross negligence," appears unenforceable and should be excised.

 Hollenbach also raises an interesting point when she notes that, if the UC Committee intends to pursue deficiency claims against the partners on behalf of the estate, it would be well-advised to "maintain" the automatic stay post-confirmation to prevent other ambitious creditors from also pursuing the partners simultaneously in other jurisdictions. We cannot agree with the implicit assumption of this argument that the automatic stay arising from this case presently covers deficiency suits against the partners, as we noted in our discussion of Ryan's § 1129(a)(7) objection, at page 381 *supra.* We therefore do not agree with Hollenbach that the absence of such a provision in any way renders the Plan unconfirmable. Those Plan provisions authorizing the UC Committee to act are Code-permissible without any accompanying extension of the automatic stay or which would effectively be on imposition of an injunction pursuant to 11 U.S.C. § 105(a) as to the partners. *See University Medical Center, supra,* 82 B.R. at 756–57. However, the UC Committee may want to consider amending its Plan to attempt to impose such a § 105(a) injunction. On the other hand, except for a state court suit by Bechtle and Ryan against Neeson, Salmon, and Stephen J. Springer, which we understand no party has argued is stayed by this case, we are unaware of any actions ·pending against any individual partners arising out of the Debtor's dissolution, and therefore such a provision may be unnecessary.

Finally, we believe that, as McDonald points out, the Plan should be amended to clarify his status by meshing the "former" and "present" partner definitions, presumably to clarify his status as a former partner.

All of the foregoing observations of potential problems with the Plan will be handled thusly, in light of our belief that most of these problems could have been ironed out in negotiations, but that the large number of objections raising seemingly more fundamental bases of differences made negotiations difficult. We will not rule at all on confirmation of the Plan at this time, but will give the UC Committee until November 23, 1998, to file and serve an amended plan curing the objections which the UC Committee, in light of this Opinion, deem potentially meritorious. A hearing to consider confirmation of the amended plan will then be conducted on December 2, 1998. As all of these potential problems appear minor, we perceive no need for the UC Committee to proceed more elab-

orately than by filing a motion pursuant to Federal Rule of Bankruptcy Procedure 3019 to have the votes for the Plan counted for the amended plan. Of course, the UC Committee may opt not to amend the Plan and provide good reasons for not wanting to do so. We note that it is our sense that the primary objections to the Plan lack merit and that the Plan could conceivably be confirmed as it stands. However, the UC Committee should be given an opportunity, under the circumstances, to improve it.

### D. CONCLUSION

An order consistent with this Opinion will be entered.

### ORDER

AND NOW, this 13th day of November, 1998, after a hearing of October 21, 1998, to consider confirmation of the Liquidating Plan of Reorganization ("the Plan") filed by the Official Committee of Unsecured Creditors ("the UC Committee"), finding that the Plan is fundamentally confirmable but that the UC Committee may wish to amend the Plan in several apparently minor respects in light of the foregoing Opinion, it is hereby ORDERED as follows:

1. The UC Committee shall be accorded the opportunity to file a black-lined copy of any further Amended Plan and a Motion pursuant to F.R.B.P. 3019 and shall serve same on all interested parties listed below, all parties voting on the Plan, all parties requesting notices per F.R.B.P.2002(i), and the court in chambers, on or before November 23, 1998.

2. A hearing to consider any Motions filed and confirmation of the instant Plan or any Amended Plan filed shall be conducted on

WEDNESDAY, DECEMBER 2, 1998, AT 9:30 A.M. and shall be held in Bankruptcy Courtroom No. 1, Second Floor, 900 Market Street, Philadelphia, PA 19107.